NCRIC, INC., Appellant,

v.

COLUMBIA HOSPITAL FOR WOMEN
MEDICAL CENTER, INC.,
Appellee.

No. 05–CV–1269.

District of Columbia Court of Appeals.

Argued Oct. 5, 2006.
Decided Oct. 2, 2008.

Douglas W. Baruch, Washington, with whom Elliot E. Polebaum and Stephen D. Robinson were on the brief, for appellant.

Priya R. Aiyar, with whom Michael K. Kellogg, Mark Hansen, and Brendan J. Crimmins, Washington, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and KING, Senior Judge.

GLICKMAN, Associate Judge:

In October 2000, NCRIC, Inc. ("NCRIC," formerly the National Capital Reciprocal Insurance Company), a provid-

er of medical malpractice insurance to District of Columbia physicians, sued the Columbia Hospital for Women Medical Center, Inc. ("Columbia") in Superior Court for breach of their insurance contract. Columbia counterclaimed, alleging, inter alia, that NCRIC breached the contract and also tortiously interfered with Columbia's business relations with its physicians. After a two-week trial, a jury rejected NCRIC's claim and found in favor of Columbia on its counterclaims. The jury awarded Columbia damages of $220,002 on its breach of contract claim and $18 million on its tortious interference claim.

NCRIC asks us to reverse the verdict and remand for a new trial. Its appeal focuses on Columbia's tortious interference claim. Columbia charged that NCRIC induced over thirty of its attending physicians to leave the hospital in the summer and fall of 2000 in retaliation for Columbia's resistance to NCRIC's improper demands for insurance payments to which it was not contractually entitled. According to Columbia, this NCRIC-induced "exodus" of almost half its medical staff ultimately forced it to cease operations in May 2002. NCRIC denied that it induced Columbia's physicians to leave or that it was responsible for Columbia's demise. NCRIC claimed the physicians bailed out because they realized Columbia was dying, and it did what was appropriate in the circumstances to preserve its existing contractual relationships with them.

Although NCRIC disagrees with the verdict, it does not challenge the sufficiency of the evidence to permit the jury's finding of tortious interference. Its appeal presents three other issues. The first issue concerns the trial court's instruction on the elements of the tort. NCRIC asserts the court erred by failing to tell the jury it had to find some wrongful conduct on NCRIC's part in order to impose liabili-

ty for its intentional interference with Columbia's business relations. We conclude the court did not err in rejecting NCRIC's request for such an instruction. Wrongful conduct is not an element of a prima facie case of tortious interference under District of Columbia law. Rather, the burden was on NCRIC to establish that its intentional interference was legally justified or privileged. NCRIC might have been entitled to an affirmative defense instruction to that effect, but it never requested one. The trial court was under no duty to craft such an instruction for NCRIC *sua sponte.*

The second issue NCRIC raises is whether Columbia presented sufficient evidence to support the jury's award of $18 million for the tortious disruption of its business relations. NCRIC contends that Columbia's evidence of its damages was speculative or flawed in various respects. We reject NCRIC's challenges to the award, mainly because NCRIC did not preserve them at trial.

Lastly, NCRIC contends the trial court should have granted its request for a remittitur in light of evidence that a Columbia witness overstated one component of the hospital's damages by a million dollars. Because it is speculative whether the million dollar error actually affected the amount of the jury's award, we conclude the court did not abuse its discretion in denying NCRIC's request.

## I. Summary of the Facts

Founded in 1866, Columbia was a federally chartered hospital specializing in the provision of health care to women and infants in the District of Columbia. NCRIC, a company created by local physicians in 1980, is the leading provider of medical malpractice insurance in the District. In 1993, Columbia and NCRIC entered into a malpractice insurance program known as the "Retrospective Rating

Plan" or "Retro Plan." The Retro Plan was designed to lower the premiums paid by Columbia's attending physicians by having Columbia and NCRIC share the malpractice risk. Under the Plan, Columbia and NCRIC agreed to adjust the initially discounted premiums retrospectively on the basis of actual loss experience. If losses for a given plan year proved to be higher than anticipated, Columbia was to pay NCRIC an additional premium. If the losses were lower than expected, NCRIC was to give Columbia a refund.

By September 1996, when the original Retro Plan expired, the parties had determined that NCRIC owed Columbia a refund for the first year of the program, 1993–1994. In November 1996, however, NCRIC proposed that no money be exchanged until all claims for all the plan years were resolved. Columbia accepted that proposal. NCRIC agreed to pay interest on amounts it owed Columbia.[1]

Without formally renewing the Retro Plan, Columbia and NCRIC continued after 1996 to operate in accordance with its terms. NCRIC did not send out termination notices and Columbia's physicians still received premium discounts. Meanwhile, however, Columbia's claims record and financial condition were sources of growing concern. In late 1997, NCRIC informed Columbia that it would terminate the Retro Plan because of the hospital's "precarious financial condition" unless Columbia paid NCRIC $1.7 million. This was the amount NCRIC believed Columbia owed in additional premium payments in light of claims experience to that point. NCRIC later reduced the sum it required as a condition of renewal to $1 million. Columbia objected but acceded to NCRIC's demand in order to prevent the abrupt cancellation of its physicians' malpractice insurance coverage. Columbia understood the million dollar payment as equivalent to an escrow of funds or "security deposit" that would "stay on Columbia's books" and earn interest, pending the resolution of all covered malpractice claims and the final determination of the parties' liabilities.

In February 1998, Columbia filed for bankruptcy. The filing was precipitated by the decision of Columbia's main lending institution to foreclose on a $22 million line of credit. Columbia's witnesses at trial identified NCRIC's demand for $1 million as a substantial contributing cause of its bankruptcy. NCRIC presented expert witness testimony that Columbia was failing because, as a maternity hospital offering a limited range of obstetric and gynecological services, it occupied a vulnerable niche position in a highly competitive health care market with substantial excess capacity.

While Columbia was in bankruptcy, it received a proposal for malpractice insurance from Medical Inter–Insurance Exchange ("MIIX"), a national insurance company. The MIIX proposal appeared to be considerably less expensive than NCRIC's Retro Plan. Upon learning of the competitive offer, NCRIC sent Columbia a letter stating that its "insureds are obviously concerned with the hospital's attempt to replace NCRIC with a 'foreign' company," and that Columbia "should understand that NCRIC intends to continue providing its much needed insurance protection to the physicians in this program with or without the support of [Columbia]." NCRIC representatives directly urged Columbia's physicians to move to other hospital programs where they could maintain their NCRIC insurance coverage if Columbia discontinued its participation in the Retro Plan. Reportedly, NCRIC's

---

1. The only plan years for which all claims had been closed out by the time of trial were 1993–1994 and 1995–1996. NCRIC owed Columbia a refund for each of those years.

officers told the physicians that NCRIC's lawyers would not represent them in malpractice suits if Columbia obtained coverage from MIIX, and falsely stated that members of Columbia's Board of Directors stood to gain personally from selecting MIIX as their insurer. Columbia's Board ultimately decided to renew its Retro Plan with NCRIC.

Columbia emerged from bankruptcy with a court-approved plan of reorganization in February 1999. Among other things, Columbia renegotiated its contracts with HMOs and vendors; added a new wing of luxury suites and expanded its range of medical services beyond obstetrics and gynecology; recruited surgeons; and cut its operating deficit in half. The efficacy of these turn-around efforts was disputed at trial. There was evidence that the hospital's admissions and market share increased, and that it stopped losing money in May 2000. Its chief executive officer testified that the hospital would have made a profit in fiscal year 2000 if patient referrals had remained stable. NCRIC presented evidence, however, that Columbia was able to offset its operating losses only by selling assets to raise cash—a short-term stopgap rather than a viable business strategy. There was testimony linking Columbia's on-going financial difficulties to serious operational and patient safety problems, including supply shortages and loss of nursing staff.

In the spring of 2000, Columbia and NCRIC began negotiating renewal of the Retro Plan, which was set to expire in September of that year. Columbia's Board was interested in reducing the hospital's risk exposure, while NCRIC was concerned Columbia would be unable to carry its share of the potential liabilities in malpractice cases. Columbia also sought to recover its $1 million "deposit," and claimed that NCRIC had miscalculated its minimum premium payments under the old Retro Plan and owed Columbia approximately $400,000 in addition to the refunds due for two plan years. NCRIC, however, claimed that Columbia still owed premiums for prior years.

NCRIC initially requested that Columbia pay $944,000 as a condition of renewing the Retro Plan. Columbia refused, and NCRIC reduced its demand to $750,000. In June 2000, NCRIC's CEO, Mr. Pate, told Columbia's CEO, Mr. Wilson, that "there was going to be a train wreck" if Columbia rejected NCRIC's demand, and that Columbia's doctors would "leave and go to Sibley [Hospital]." Wilson took this statement as a "threat."

On June 27, 2000, the Columbia Board rejected NCRIC's terms and directed Wilson to continue negotiating with NCRIC. The following day, after being informed of Columbia's decision, NCRIC issued a formal notice that the Retro Plan would terminate on September 1, 2000. Wilson testified he did not expect to receive the notice of termination because NCRIC had never "done anything like this in prior years of negotiation."

Two days later, NCRIC cancelled a separate malpractice insurance policy it had issued six months earlier to cover Columbia's community health clinic. This was a bolt from the blue for Columbia, as the clinic was current on its premium payments. Atypically, NCRIC's letter announcing the termination did not explain the reason for its action. At trial, NCRIC witnesses testified that the clinic policy was cancelled because Columbia's self-insurance trust was underfunded—a fact NCRIC knew when it issued the policy. Columbia's Board viewed the termination of the Retro Plan and the clinic policy as "retaliation by NCRIC because [the Board] refused to acquiesce to their money demand."

On July 10, 2000, NCRIC issued bills to Columbia's physicians that did not include the Retro Plan discount, charging tens of thousands of dollars more in premiums than the physicians had expected. NCRIC had never issued undiscounted bills during previous renegotiations of the Retro Plan, even when the parties operated for over a year without any insurance contract in place. As one Columbia doctor testified, upon receiving the July bills, "physicians panicked and ... had to make a decision immediately as to what they wanted to do. Did they want to pay the full amount or are they going to get a discounted amount at the place where [NCRIC] will tell them to go[?]" At about the same time, NCRIC's Board Chairman met with leading members of Columbia's medical staff and advised them that "if Columbia does not have a Retro Plan with NCRIC, ... the doctors should pack and leave because the hospital is going to close." A "Plan of Action" adopted by NCRIC's Board of Directors on July 11, 2000, envisioned that NCRIC would help "our [Columbia] physicians" transfer to NCRIC-insured programs at other District of Columbia hospitals.

NCRIC and Columbia continued to negotiate a renewal of the Retro Plan. A tentative agreement reached on August 15 was disavowed by NCRIC's CEO, Mr. Pate. With the Retro Plan due to expire on September 1, Columbia secured alternative coverage from another malpractice insurance carrier. However, Columbia's CEO, Mr. Wilson, testified that this was "too little, too late" to prevent physicians from leaving the hospital.

On October 1, 2000, NCRIC issued an unusual endorsement to all its individual malpractice insurance policies. The endorsement excluded coverage for any medical care its insured physicians might render at Columbia's community health clinic after November 15, 2000. The letter from NCRIC's Director of Underwriting announcing the new exclusion stated that "NCRIC no longer considers it a prudent underwriting risk to insure any activities at the Clinic." The obvious effect of this announcement was to discourage any NCRIC-insured physician from seeing clinic patients.

Over thirty attending physicians—forty percent of its medical staff—left Columbia in the summer and fall of 2000. Many of them went to other hospitals where NCRIC provided them with equivalent insurance coverage at reduced rates. Witnesses at trial attributed the unprecedented "mass exodus" to NCRIC's actions: the termination of the Retro Plan and the clinic's insurance coverage, the issuance of undiscounted bills, the direct communications between NCRIC and the doctors, and the adoption of the exclusionary endorsement. Departing doctors cited the loss of NCRIC insurance coverage as the reason they reluctantly decided to relocate their hospital and clinic practices. On the other hand, some former Columbia physicians testified that they and other members of their practice groups left because of concerns about patient safety, quality of care, and the hospital's weak financial condition and uncertain future—reasons unrelated to NCRIC's conduct. Columbia countered that this testimony was not credible, noting, for example, that the witnesses were still dependent on NCRIC and that, in spite of their professed concerns, they continued to refer a small number of patients to Columbia after moving their practices to other institutions.

Beginning in September 2000, all of Columbia's financial indicators—births, admissions, surgeries, in-patient days, and outpatient visits—dropped suddenly. Revenues fell by approximately $10 million per year. Witnesses at trial attributed the plunge to the departure of so many mem-

bers of the hospital's medical staff. Columbia was not able to recover. In May 2002, after fruitlessly exploring merger possibilities with three other non-profit institutions, Columbia ceased operations and closed its doors.

## II.  Proceedings Below

NCRIC began this litigation on October 2, 2000, by suing Columbia in Superior Court for breach of the parties' insurance agreement. NCRIC claimed that Columbia owed it $1.3 million in additional insurance premiums allegedly due under the Retro Plan agreement. In an amended complaint filed in January 2001, NCRIC increased its demand to over $1.9 million. Columbia asserted counterclaims for, among other things, breach of contract, breach of the implied contractual covenant of good faith and fair dealing, tortious interference with its business relations with its physicians, and tortious interference with its prospective business advantage.

The case went to trial in January 2004. Although the trial court dismissed Columbia's other counterclaims, it allowed the breach of contract and tortious interference claims to go to the jury. On February 13, 2004, the jury returned a verdict in favor of Columbia. It found NCRIC liable to Columbia for breach of contract in the amount of $220,002. While the jury concluded that NCRIC also had breached its implied covenant of good faith and fair dealing, it did not award damages on that count. In addition, the jury found NCRIC liable for tortiously interfering with Columbia's business relations (though not with its prospective business advantage), for which it awarded damages amounting to $18 million. In response to special interrogatories, the jury attributed $13 million of its award to losses sustained during the time period before Columbia ceased operations and $5 million to the period after Columbia closed.

Following the verdict, NCRIC renewed its motion for judgment as a matter of law and, in the alternative, moved for a new trial or a remittitur of damages. The trial court denied both motions with a written opinion in September 2005.

## III.  NCRIC's Claims of Error

### A.  The Jury Instruction on Intentional Interference with Business Relations

NCRIC contends the trial court erred in failing to instruct the jury that it had to find NCRIC's actions "wrongful," in addition to being intentionally disruptive of Columbia's business relations, in order to impose liability for tortious interference. Columbia argues that NCRIC failed to preserve this objection for appeal. In any event, Columbia argues, the court's instructions were correct as given.

The trial court instructed the jury on Columbia's claim of tortious interference with business relations as follows:

> In order for Columbia's claim to succeed, Columbia must prove by a preponderance of the evidence, one, the existence of a valid business relationship.
>
> Two, NCRIC's knowledge of the relationship.
>
> Three, intentional interference inducing or causing a breach or termination of the relationship.
>
> And, four, damages resulting from that breach.
>
> If you find that Columbia cannot prove any one of these elements, then you must find for NCRIC on Columbia's claim for tortious interference with business relations.

This instruction exactly tracked the one NCRIC itself had proposed. But NCRIC also proposed a supplemental instruction requiring Columbia to prove an additional element—that NCRIC's conduct was

"egregious." In pertinent part, this proposed instruction read as follows:

> In order to prove that NCRIC tortiously interfered with Columbia's business relationships or prospective business advantage, you must find that NCRIC engaged in what is termed "egregious" conduct. You must find that any interference by NCRIC was wrongful by some measure beyond the fact of the interference itself.... On the other hand, if you do find that NCRIC engaged in "egregious" conduct, you must find that Columbia has satisfied the intentional interference element of its tortious interference claims. "Egregious" conduct includes conduct such as libel, slander, physical coercion, fraud, misrepresentation or disparagement.

At the charging conference, NCRIC argued that tortious interference "has to be accompanied by behavior that is aggravated, tortious or egregious," while Columbia objected that proof of egregious conduct "is not an element [of tortious interference] under D.C. law." The trial court stated that it would review the case law cited by the parties in support of their respective positions. Ultimately, the court declared that it would not give NCRIC's supplemental instruction. NCRIC duly noted its "exception" to the omission of "the discussion of egregious conduct with respect to tortious interference." NCRIC raised no other objection to the court's instructions on the tort.[2]

On appeal, tacitly admitting that its proposed instruction was erroneous, NCRIC does not argue that tortious interference with business relationships requires proof of "egregious" misconduct. Instead, substituting a less exacting standard, NCRIC argues that it could not be held liable without proof that its conduct was "wrongful" in some respect. NCRIC faults the trial court for not instructing the jury that Columbia had to prove NCRIC's interference was wrongful as well as intentional.

■ Where the appellant has preserved the issue, we review a trial court's refusal to grant a request for a particular instruction for abuse of discretion, which may be found if the court's charge as a whole does not fairly and accurately state the applicable law.[3] In this case, however, because NCRIC consistently asked the trial court to instruct the jury that "aggravated, tortious or egregious" conduct had to be shown, and did not object to the omission of a less stringent "wrongfulness" requirement, it is debatable whether NCRIC preserved its claim of instructional error. At the time of trial in 2004, Civil Rule 51 provided that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."[4] To satisfy this requirement, "the grounds of the objection must be called to

---

2. At the charging conference, NCRIC had asked the court to include a "definition of intent" in its instructions on tortious interference. While NCRIC did not propose a definition, its supplemental instruction contained a sentence (not quoted above) declaring it "insufficient that NCRIC may have possessed a general intent to interfere or possessed knowledge that its conduct may injure Columbia's business dealing." The court did not include this language or otherwise define the requisite intent in its final instructions to the jury. NCRIC did not object to the omission.

3. *See Jung v. George Washington Univ.*, 875 A.2d 95, 110 (D.C.2005).

4. Super. Ct. Civ. R. 51 (2004). In its current form, following its revision in 2006, Rule 51 similarly provides that "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." Super. Ct. Civ. R. 51(c)(1) (2008).

the attention of the trial court in such manner as to clearly advise it as to the question of law involved, and must be sufficiently specific to bring into focus the precise nature of the alleged error."[5] The objection "must be specific enough to direct the judge's attention to the correct rule of law."[6] A request for an erroneous or misleading instruction is not sufficient to preserve a valid objection, even if the proposed instruction has buried within it "a kernel that may have some validity."[7]

■ Thus, when parties propose an instruction "more favorable to them than the law permits," the court ordinarily is "under no duty to redraw their instruction for them."[8] If the rule were otherwise, as Columbia points out in its brief, "litigants would have every incentive to request an incorrect, overreaching instruction; fail to offer a correct alternative if the trial court rejects that instruction; and then take a 'chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way.'"[9] Consequently, courts enforce the rule strictly. For example, in *Rogers v. Ingersoll–Rand Company*,[10] the defendant manufacturer of a machine that malfunctioned and maimed the plaintiff asked for an instruction that it could not be found liable if the machine was accompanied by adequate warnings. This instruction, which the district court refused to give, misstated the applicable law and unduly favored the manufacturer; a legally correct instruction, which the manufacturer failed to propose and the court did not give, would have explained that adequate warnings were *relevant* to the question of liability but not necessarily *dispositive* of that question.[11] In affirming the resulting $16.7 million judgment, the court of appeals held that even if the manufacturer would have been "entitled to a less sweeping instruction on its 'warnings' theory, . . . . [t]he district court was under no obligation to tinker with the flawed proposed instruction until it was legally acceptable."[12]

We recognized in *Pannu v. Jacobson* that a party's imperfect articulation of its position does not always excuse the trial court from "tailoring the requested instruction . . . to meet the demands of an accurate and fair statement of the law."[13] The court should "not refuse to instruct on

5. *Ceco Corp. v. Coleman*, 441 A.2d 940, 947 (D.C.1982) (internal quotation marks and citations omitted).

6. *Knight v. Georgetown Univ.*, 725 A.2d 472, 482 (D.C.1999) (internal quotation marks omitted).

7. *Pannu v. Jacobson*, 909 A.2d 178, 198 (D.C. 2006) (quoting *McCann v. Wal–Mart Stores, Inc.*, 210 F.3d 51, 55 (1st Cir.2000)); *see also Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 95 (1st Cir.2004) ("[A] party that presents its legal theory to the court only in the form of a substantially flawed instruction cannot fault the district court either for failing to separate the wheat from chaff or for refusing to give the requested instruction.") (internal quotation marks omitted).

8. *Ursich v. da Rosa*, 328 F.2d 794, 797 (9th Cir.1964).

9. Brief of Appellee at 25 (quoting *District of Columbia v. Banks*, 646 A.2d 972, 978 (D.C. 1994) (internal quotation marks omitted)).

10. 330 U.S.App. D.C. 198, 144 F.3d 841 (1998).

11. *See id.*, 330 U.S.App. D.C. at 201, 144 F.3d at 844 ("Ingersoll–Rand's proposed instruction does exactly what the District of Columbia Court of Appeals said was impermissible: it elevates the adequacy of its warnings to the sole consideration in the risk-utility analysis.").

12. *Id.*, 330 U.S.App. D.C. at 202, 144 F.3d at 845.

13. *Pannu, supra* note 7, 909 A.2d at 198.

an area of law central to the case merely because of technical defects in a proffered instruction." [14] If a proposed instruction is reasonably calculated to alert the trial court to a pertinent legal principle, a modicum of "confusing and improper wording" should not cause the trial court to "reject its contents in toto." [15] Up to a point, this precept might be considered applicable in the present case. Arguably, when NCRIC contended that *gross* misconduct had to be shown, it implicitly raised the question whether *any degree* of misconduct had to be established. And notwithstanding NCRIC's consistent use of the adjective "egregious," the second sentence of its proposed instruction would have required the jury to find only that "any interference by NCRIC was wrongful *by some measure* beyond the fact of the interference itself." (Emphasis added.) NCRIC's claim on appeal is essentially that the trial court erred by failing to tell the jury just what that sentence stated.

The preservation issue is a close one. NCRIC clearly wanted the court to set an elevated benchmark for Columbia to meet; it sought nothing less. Giving NCRIC the benefit of the doubt seems to depend on disregarding the clear import of its proposed instruction and taking a single, unheralded sentence in that instruction out of context—precisely what the trial court normally has no obligation to do. However, for the sake of argument, we shall proceed as if NCRIC's claim is preserved for appellate review. It matters not in the end, because NCRIC's position on appeal fundamentally misstates this jurisdiction's law.

We have held that to establish a prima facie case of tortious interference with contractual or other business relationships [16] in the District of Columbia, a plaintiff must prove four elements: (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; [17] and (4) resulting damages. [18] We have never declared it an element of a prima facie case that the defendant's intentional interference be otherwise wrongful.

■ Section 766 of the RESTATEMENT states:

> One who intentionally *and improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other

---

**14.** *Roger Edwards, supra* note 7, 387 F.3d at 95; *see also Pannu, supra* note 7, 909 A.2d at 197.

**15.** *Pannu, supra* note 7, 909 A.2d at 197.

**16.** "The liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations." RESTATEMENT (SECOND) OF TORTS (hereinafter, "RESTATEMENT") § 766 cmt. c (1979). *See, e.g., Casco Marina Dev., L.L.C. v. District of Columbia Redev. Land Agency,* 834 A.2d 77, 84 (D.C.2003) ("The elements of tortious interference with prospective business advantage mirror those of interference with contract.").

**17.** "[W]hile we have articulated the third element of tortious interference as procurement of breach, ... a 'breach' as such is not required, but merely a failure of performance...." *Casco, supra* note 16, 834 A.2d at 84.

**18.** *See id.,* 834 A.2d at 83; *Paul v. Howard Univ.,* 754 A.2d 297, 309 (D.C.2000); *Cooke v. Griffiths–Garcia Corp.,* 612 A.2d 1251, 1256 (D.C.1992); *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.,* 565 A.2d 285, 289 (D.C.1989); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 288 (D.C.1977).

from the failure of the third person to perform the contract.[19]

But among the jurisdictions that have addressed the question, "there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue...."[20] In the District of Columbia, that issue is settled. Instead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not.

■ As we stated in *Altimont*, "[o]nce a prima facie case has been established liability may still be avoided if the defendant can establish that his conduct was legally justified or privileged."[21] "In other words," we elaborated in *Sorrells*, "a trier of fact may find for the plaintiff who presents a prima facie case unless the defendant proves that his or her conduct was justified or privileged."[22] We explained that while the RESTATEMENT describes the tort as involving intentional and improper conduct, its "reference to 'improper' conduct is simply another way of saying that the alleged tortfeasor's conduct must be legally justified."[23]

An instruction requiring the jury to find "that any interference by NCRIC was wrongful by some measure beyond the fact of the interference itself" would have led the jury astray by erroneously placing on Columbia the burden of proving wrongful conduct as part of its prima facie case.

Such an instruction therefore should not have been given. (Still less should the trial court have given the "egregious conduct" instruction that NCRIC actually proposed.)

■ NCRIC might have been entitled to an instruction on legal justification or privilege as an affirmative defense to intentional interference. NCRIC justified its intentional interference with Columbia's business relations as being necessary to protect its own existing economic interests, i.e., its insurance contracts with Columbia's physicians. Previous decisions of this court have recognized such a justification as affording a possible basis for an affirmative defense to tortious interference.[24] Thus, NCRIC might have requested a jury charge modeled on RESTATEMENT § 773, which states:

One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

This defense "is of narrow scope," however, "and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means."[25] Perhaps, as a mat-

19.   RESTATEMENT § 766 (emphasis added).

20.   *Id.* § 767 cmt. k.

21.   374 A.2d at 288 (citing, inter alia, *Deoudes v. G.B. Macke Corp.*, 153 A.2d 309 (D.C.1959), and *Meyer v. Washington Times Co.*, 64 App. D.C. 218, 76 F.2d 988 (1935)).

22.   *Sorrells, supra* note 18, 565 A.2d at 290.

23.   *Id.*

24.   *See Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C.1991); *Dresser v. Sunderland Apartments Tenants Ass'n*, 465 A.2d 835, 839 n. 12 (D.C.1983). The "privilege" to protect one's own economic interests is not absolute. *See, e.g.*, RESTATEMENT § 767 cmts. f, g.

25.   RESTATEMENT § 773 cmt. a. Had NCRIC sought an instruction along the lines of Section 773, the jury might have required additional guidance with respect to each of the three elements of the defense. *See, e.g., Sor-*

ter of litigation strategy, NCRIC wanted to avoid an instruction explicitly requiring it to shoulder the burden of proving such a defense. Be that as it may, NCRIC did not request an affirmative defense instruction, and its objection to the absence of any "discussion of egregious conduct" did not suffice to inform the court that one was desired, or what it might have said. NCRIC therefore forfeited its objection to the court's failure to include such an instruction in its jury charge.[26] The court "had no further obligation to piece together an unpleaded [affirmative defense] theory that [NCRIC] had only hinted at by proposing a defective instruction."[27].

## B. Sufficiency of the Evidence of Damages

The jury awarded Columbia $18 million in damages proximately caused by NCRIC's interference with the hospital's business relations with its physicians—$13 million for losses sustained before the hospital closed and an additional $5 million for post-closing loss. NCRIC disputes the sufficiency of the evidence to support the award; it asserts the trial court erred by allowing the jury to award tort damages based on (1) "a legally flawed · damages theory," and (2) "speculative and logically incoherent damages evidence."[28]

▮ The principles governing our review of NCRIC's sufficiency challenge to the damages award are well-established.

We are obliged to respect the jury's prerogatives. A trial court may grant a motion for judgment as a matter of law "only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor."[29] Our review in this connection is *de novo*, applying the same legal standard as the trial court. The trial court has more leeway to evaluate the probative value of the evidence in deciding whether to grant a new trial, and its decision on that score is subject to reversal "only for abuse of discretion."[30] "The scope of appellate review is especially narrow when the trial court denied the motion, as in that case the trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference given to the jury's determination of such matters of fact as the weight of the evidence."[31]

▮ These principles of deference to the jury are especially applicable to its determination of damages.

A plaintiff need prove damages only with reasonable certainty. While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award.[32]

*rells, supra* note 18, 565 A.2d at 290 (listing "seven factors which should be considered in determining whether interference with a contract is 'improper' ") (citing RESTATEMENT § 767).

**26.** *See Dyer v. William S. Bergman & Assocs., Inc.,* 657 A.2d 1132, 1137 n. 5 (D.C.1995) (holding that appellant forfeited potentially meritorious defense to tortious interference claim, where, inter alia, he neither requested jury instruction nor objected to omission in judge's charge).

**27.** *Roger Edwards, supra* note 7, 387 F.3d at 97.

**28.** Brief of Appellant at 12.

**29.** *Liu v. Allen,* 894 A.2d 453, 459 n. 10 (D.C. 2006).

**30.** *Id.* (internal quotation marks omitted).

**31.** *Id.* (internal quotation marks omitted).

**32.** *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 549–50 (D.C.1981) (citations omitted).

"The evidence offered must form an adequate basis for a reasoned judgment;" [33] "mathematical precision" is not required.[34] Furthermore, "the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible." [35] "Where the jury finds a particular quantum of damages and the trial judge refuses to disturb its findings on the motion for a new trial ... an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial." [36]

At trial, Columbia linked the bulk of its claimed damages to the loss of net revenue caused by the NCRIC-induced departures of many of its attending physicians. According to Columbia's chairman and its CEO, the hospital's annual gross revenues dropped by ten million dollars. The witnesses attributed this gross revenue loss to the sudden drop in patient referrals, which were the hospital's main source of income.[37] Assuming Columbia operated at a marginal cost rate of 30%—a conservative estimate, according to Peter Ben Ezra, a certified public accountant familiar with Columbia's finances [38]—its annual net revenues dropped by $7 million.

In addition, Ben Ezra testified that he calculated the present value of the lost cash flow from the decline in admissions assuming a permanent loss of twenty-four physicians on Columbia's staff as a result of NCRIC's interference. Using a 30% marginal cost rate and a discount rate of 10.5%, Ben Ezra computed that Columbia lost approximately $5 million before it closed and would have lost $21 million to $22 million over a twenty-year time frame had it survived.

The chairman of Columbia's Board, Dr. Rifka, identified another component of its damages from NCRIC's tortious interference. Dr. Rifka testified that Congress had appropriated $5 million to support the hospital's on-going community outreach programs in 2002. Columbia was unable to collect that grant and use it to defray the costs of its operations before it was forced to close.

On its face, Columbia's evidence of its damages was sufficient to support the award. Even if the jury rejected Ben Ezra's optimistic long-term cash flow projections in their entirety, it still could have found that Columbia's annual net patient revenues (gross revenues less marginal costs) declined by $7 million in the near-term as a result of NCRIC's conduct. In his closing argument, Columbia's counsel

---

**33.** *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C.1982).

**34.** *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C.2001).

**35.** *Hawthorne v. Canavan*, 756 A.2d 397, 401 (D.C.2000) (internal quotation marks and brackets omitted) (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 52, at 350 (5th ed.1984)).

**36.** *Carter v. Duncan–Huggins, Ltd.*, 234 U.S.App. D.C. 126, 140, 727 F.2d 1225, 1239 (1984) (quoting *Taylor v. Washington Terminal Co.*, 133 U.S.App. D.C. 110, 113, 409 F.2d 145, 148 (1969) (emphasis omitted)).

**37.** NCRIC argues that much of the decline occurred because Columbia stopped selling assets to offset operating losses.

**38.** Without objection, Ben Ezra testified, inter alia, that Columbia's comptroller told him to utilize a 30% marginal cost rate in preparing financial information for the hospital prior to the litigation. Based on his experience, this was a conservative estimate to use in his damages analysis, because the hospital's marginal costs were "relatively small." Ben Ezra cited medical journal articles indicating that marginal cost rates for hospitals typically ranged from 16% to 18%.

expressly urged the jury to use that figure to calculate the hospital's damages. To compensate Columbia for its lost revenues in the twenty-two months before it ceased operations, counsel thus requested $13 million,[39] which was precisely what the jury awarded for that period. On the same principle, and on the premise that Columbia would have survived at least three more years without NCRIC's tortious interference, counsel asked for an additional $21 million as post-closing damages. He reminded the jury that even NCRIC's expert witness had opined Columbia might have survived one year. The jury's actual award of $5 million in post-closing damages was supported on the conservative assumption that Columbia would have continued operating for as little as nine months.[40]

█ If the jury calculated Columbia's lost revenues as its counsel proposed, it did not award any compensation for its lost congressional appropriation (which counsel had sought as part of the hospital's pre-closing damages). While the jury could have based its damages award on other reasonable permutations of the evidence, we "need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted. Nor need we explore every possible quantitative analysis or compute the basis of each penny and dollar in the award."[41] The jury's "award will be upheld as long as it is a 'just and reasonable estimate based on relevant data,' even if it is not proven with mathematical precision."[42]

█ We turn now to NCRIC's challenges to the sufficiency of the foregoing evidence to support the jury's award. Most of those challenges were not preserved for appellate review. In a civil jury trial, Civil Rule 50(a) requires a party to assert its specific claims of evidentiary insufficiency in a motion for judgment as a matter of law before the case is submitted to the jury.[43] One important purpose of this requirement "is to call the attention of the opposing party to the alleged deficiency in the evidence at a point in the trial where that party may cure the defect by presentation of further evidence."[44] The failure to assert a particular sufficiency challenge in a Rule 50(a) motion precludes consideration of that challenge on appeal.[45]

39. ($7 million ÷ 12) × 22 = $12.833 million.

40. ($7 million ÷ 12) × 9 = $5.25 million.

41. *Carter, supra* note 36, 234 U.S.App. D.C. at 140, 727 F.2d at 1239 ("Our inquiry ends once we are satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity.").

42. *Affordable Elegance Travel, supra* note 34, 774 A.2d at 329 (quoting *Edmund J. Flynn, supra* note 32, 431 A.2d at 550).

43. Super. Ct. Civ. R. 50(a) states as follows: (a) *Judgment as a matter of law.* (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

44. *Howard Univ. v. Best,* 547 A.2d 144, 148 (D.C.1988).

45. *Id.* at 147. *See also, e.g., Cummings v. GMC,* 365 F.3d 944, 950 (10th Cir.2004) ("The motion must include all issues challenged, as the failure to move for a directed verdict [now judgment as a matter of law] on a particular issue will bar appellate review of that issue.") (internal quotation marks and citation omitted), abrogated in part on other grounds, *Unitherm Food Sys., Inc. v. Swift*

■ NCRIC's principal claim is that the evidence does not support the jury's award because Columbia's theory of damages was flawed. Specifically, NCRIC argues that hypothetical "lost profits" are not a proper measure of Columbia's damages because Columbia has never been a profitable business.[46] Moreover, NCRIC contends, Columbia calculated its lost revenue stream improperly, because it should have reduced its hypothetical gross patient revenues by its total costs (i.e., including its fixed costs) rather than just its marginal costs (i.e., its variable costs). Relatedly, NCRIC also claims there was insufficient evidence at trial to link the $10 million drop in Columbia's patient revenues to NCRIC or to justify Ben Ezra's adoption of a marginal cost rate of 30% (as opposed to some other, significantly higher percentage). The factual and legal merits of these contentions are debatable, but—more importantly—NCRIC did not include them in its Rule 50(a) motions for judgment as a

matter of law.[47] We decline to consider them.

■ NCRIC also argues that the "lost" congressional appropriation for Columbia's community outreach programs cannot support the jury's award because it was not adjusted downward to reflect the expenses the hospital would have incurred in carrying out those programs.[48] We decline to address this issue because, once again, NCRIC did not preserve it by appropriate objection at trial. When Columbia's counsel argued to the jury that the appropriated funds would have gone "straight to the bottom line," NCRIC did not object or dispute the assertion. Nor did NCRIC raise Columbia's failure to set off its outreach program costs against the congressional appropriation in its Rule 50(a) motions during trial. NCRIC first mentioned that defect in its renewed motion for judgment as a matter of law after the verdict, which it filed pursuant to Civil Rule

---

*Eckrich, Inc.*, 546 U.S. 394, 405–07, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006); *Whelan v. Abell*, 310 U.S.App. D.C. 396, 400, 48 F.3d 1247, 1251 (1995) (explaining that defendants' omission of theory in Rule 50(a) motion "waived that theory as a basis for judgment as a matter of law"); 9B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2533, at 504 (3d ed. 2008) ("The statement of one ground precludes a party from claiming later that the motion should have been granted on a different ground.").

**46.** *Cf. Rich v. Eastman Kodak Co.*, 583 F.2d 435, 437 (8th Cir.1978) ("Missouri law is clear that anticipated profits are recoverable only where there is proof of income and expenses prior to the interruption or stoppage of the business.... To capitalize income as Rich attempted, he would have to show net income from his operations prior to the difficulty with Kodak so as to establish a continuing, average and stable basis for the projection; otherwise his playing with figures is too speculative and conjectural to sustain any verdict."); *but see, e.g., Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 257–58 (Tex. App.1987) (rejecting contention that a "busi-

ness which operates at a loss ... cannot recover lost profits": "It is entirely possible that a business can make a profit on individual jobs, yet still end up with a net year-end loss.... [S]imply because a business may have a net loss does not mean that it cannot suffer further damage at the hands of another.") (internal quotation marks and citations omitted).

**47.** NCRIC likewise did not object on these grounds to the trial court's instructions on compensatory damages. Its principal contentions at trial were that Ben Ezra's analysis was unsound in other respects and that damages flowing from the loss of a possible future government grant were too speculative to be awarded.

**48.** *See, e.g., Cromartie v. Carteret Sav. & Loan*, 277 N.J.Super. 88, 649 A.2d 76, 83 (1994) (" 'Lost profits' signifies the difference between gross income and the costs or expenses which had to be expended to produce the income. Proof of the relevant costs or expenses is not a matter of mitigation. It is part of the damage case of the party seeking recovery for lost profits.").

50(b).[49] That was too late; new grounds may not be asserted in the post-verdict motion.[50]

◼ Lastly, NCRIC challenges Ben Ezra's expert opinion testimony as being too speculative (or flatly disproved by the evidence) because he assumed that: (1) Columbia would have remained alive for twenty-five years but for NCRIC's interference; (2) at least twenty-four physicians left Columbia because of NCRIC's conduct; and (3) those physicians would have stayed for twenty years or longer (until they retired at age sixty-five) but for NCRIC's interference. We are satisfied NCRIC preserved this challenge. However, although Ben Ezra's premises were questionable, there was at least some evidence to support their reasonableness. As discussed above, the evidence permitted the jury to ascribe the mass departure of physicians from Columbia to NCRIC's interference and to disbelieve the doctors who claimed they left for other, unrelated reasons. There also was testimony regarding Columbia's enhanced viability following its emergence from bankruptcy and of the long-term loyalty of its attending physicians. The shortcomings in Ben Ezra's analysis were exposed and probed at trial; we agree with the trial court that they went to the weight of his testimony rather than its admissibility and therefore were for the jury to assess. Moreover, in awarding only $5 million in post-closing damages, the jury evidently rejected Ben Ezra's loss projections as too speculative. The jury had other evidence—specifically, the abrupt drop in Columbia's annual revenues after a large proportion of its doctors left—on which to base its verdict.

## C. Request for Remittitur

◼ As an alternative to judgment as a matter of law, NCRIC moved for a new trial pursuant to Civil Rule 59(a).[51] Among other things, NCRIC asked the trial court to grant a new trial unless Columbia accepted a remittitur of $1 million of the $5 million post-closing damages award. In support of this request, NCRIC asked the court to take judicial notice that the actual amount of Congress's grant to Columbia in 2002 for outreach programs was $1 million less than Columbia's chairman, Dr. Rifka, had testified at trial.[52] Observing that NCRIC had not objected to the congressional appropriation testimony at trial, the court declined to notice new facts outside the trial record and refused to grant a remittitur.

**49.** In pertinent part, Civil Rule 50(b) provides that "[i]f, for any reason, the Court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the Court is considered to have submitted the action to the jury subject to the Court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment...." Super. Ct. Civ. R. 50(b).

**50.** See Best, supra note 44, 547 A.2d at 147 ("Super.Ct.Civ. R. 50(b) requires that in order to move for judgment notwithstanding the verdict, a party must first move for a directed verdict on 'the precise claim made in the motion for judgment n.o.v. ....' ") (quoting U.S. Indus., Inc. v. Blake Construction Co.,

217 U.S.App. D.C. 33, 42, 671 F.2d 539, 548 (1982)). (The terminology used in Best— "motion for a directed verdict" and "motion for judgment notwithstanding the verdict" or "motion for judgment n.o.v."—has been replaced by the single term "motion for judgment as a matter of law.")

**51.** Super. Ct. Civ. R. 59(a).

**52.** See Departments of Labor, Health & Human Services, and Education, and Related Agencies Appropriations Act, 2002, Pub.L. No.107–116, 115 Stat. 2177, 2187 (Jan. 10 2002) (appropriating $4 million to Columbia for its outreach programs); Sierra Club v. Callaway, 499 F.2d 982, 989–90 (5th Cir. 1974) (taking judicial notice of congressional appropriation).

The trial court did not abuse its discretion by so ruling.[53] We agree with NCRIC that the court "may reduce a damage award when it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there."[54] That standard is not met here, however. Contrary to NCRIC's assumption, it is not apparent that the award of $5 million for post-closing damages represented the lost congressional appropriation. The jury was not asked to identify the basis for its post-closing award, and it did not do so. Although the amount of the award equaled the supposed amount of the appropriation (per Dr. Rifka), there are reasons to doubt the two are related. The evidence of lost patient revenues could have explained the award in its entirety, or at least in part, and it is less than plausible that the jury awarded no such revenues at all as post-closing damages. Moreover, in closing argument, Columbia's counsel asked the jury to treat the lost appropriation as pre-closing damages, not as post-closing damages. In the end, it remains speculative whether, or to what extent, the congressional appropriation factored into the jury's award at all—too speculative for us to conclude the trial court abused its discretion by declining to remit $1 million based on the correct amount of the appropriation.[55]

## IV. Conclusion

The judgment of the Superior Court is *Affirmed.*

---

**53.** We review the grant or denial of a motion for remittitur for abuse of discretion. *See Scott v. Crestar Fin. Corp.,* 928 A.2d 680, 688 (D.C.2007); *Croley v. Republican Nat'l Comm.,* 759 A.2d 682, 703 (D.C.2000).

**54.** *Pratt v. Univ. of District of Columbia,* 691 A.2d 158, 159 (D.C.1997) (internal quotation marks and citation omitted). *Cf. Scott, supra* note 53, 928 A.2d at 688 ("An excessive verdict is one which is beyond all reason, or is so great as to shock the conscience.... [But] [e]xcessiveness refers not only to the amount of the verdict but to whether, in light of all the facts and circumstances, the award of damages appears to have been the product of passion, prejudice, mistake, or consideration of improper factors rather than a measured assessment of the degree of injury suffered by the plaintiff.") (internal quotation marks and citations omitted).

**55.** Viewing NCRIC's new trial motion as one based on newly discovered evidence (*i.e.,* the legislation in which Congress granted funds to Columbia for its outreach programs, which NCRIC did not discover until after the verdict) does not alter our conclusion. A movant relying on newly discovered evidence must show: (1) that it discovered the evidence after the trial; (2) that its failure to discover the evidence in time for use at trial was not due to its lack of diligence; (3) that the new evidence is not merely cumulative or impeaching; and (4) that the new evidence probably would produce a different verdict if a new trial were held. *See, e.g., Thorn v. Walker,* 912 A.2d 1192, 1198 (D.C.2006). We need not address whether NCRIC satisfied the first three requirements; for the reasons explained above, it did not satisfy the fourth.