**WASHINGTON INVESTMENT PARTNERS OF DELAWARE, LLC, Appellant,**

v.

**The SECURITIES HOUSE, K.S.C.C., et al., Appellees.**

**Nos. 09–CV–670, 09–CV–1031.**

District of Columbia Court of Appeals.

Argued Sept. 8, 2010.

Decided Sept. 15, 2011.

Dale A. Cooter, with whom Donna S. Mangold, Washington, DC, was on the brief, for appellant.

W. Ray Persons, with whom Ashley C. Parrish, Washington, DC, and Richard T. Marooney were on the brief, for appellees.

Before WASHINGTON, Chief Judge, OBERLY, Associate Judge, and FARRELL, Senior Judge.

WASHINGTON, Chief Judge:

Washington Investment Partners ("WIP"), a Delaware Corporation operating in the District, appeals from several rulings of the trial court in favor of appellees, a Kuwaiti investment corporation and its affiliates.[1] WIP raises many issues, none of which we find to have merit. Thus, we affirm.

## I. FACTS

This case is the culmination of a business deal gone bad between two parties who contracted to purchase and manage a building in Washington, D.C., called the Transpoint Building ("Transpoint").[2] Under the first of two contracts between the parties, called the "Letter Agreement," appellees paid WIP to locate and facilitate the purchase of Transpoint as an investment property for appellees. The Letter Agreement provided that the parties would negotiate a second agreement, called the "Asset Management Agreement" ("AMA"), and laid out many of the AMA's essential terms. Under the AMA, WIP was appointed manager of the appellees' investment in the building, responsible for securing a return for appellees through a continued lease or a resale of the property. The AMA contained a schedule of fees to be paid to WIP, including a monthly fee for its management services and a large payout in the event that WIP secured a new lease in, or a profitable resale, of the building. The AMA

1. Appellees Securities House and Global Securities House ("GSH") are Kuwaiti corporations in the business of trading securities and other assets in Kuwait and the United States. Appellees Transpoint Building Company ("TBC") and Transpoint Building Company Funding Corporation ("TBC Funding") are companies formed and controlled by the principal executives of Securities House and

GSH, Aymen and Fahed Boodai. They were formed for the purposes of the transaction at issue here. We refer to appellees collectively throughout this opinion.

2. The building at issue was at all relevant times leased by the General Services Administration to house the offices of the Coast Guard.

also included clauses that allowed WIP to be terminated as manager if WIP failed to provide certain services to appellees or if the individual executives in charge of WIP at the time ever left the company. Under the AMA, once terminated, WIP would no longer be entitled to payment of any fees. In what was called its "Integration Clause," the AMA stated that it embodied the entire understanding of the parties and specifically terminated the Letter Agreement.

While WIP was successful in facilitating appellees' acquisition of the building, appellees found that after signing the AMA, WIP failed to perform its duties as manager and that one of WIP's executives had arranged to leave the company. As a result, appellees terminated WIP as manager. Appellees later sold the building for a large profit. WIP believed that it should have been entitled to the payout upon the sale of the building, but appellees refused to pay WIP any further fees.

WIP subsequently sued appellees for hundreds of millions of dollars in fees and disgorgement damages on theories of breach of both contracts, breach of fiduciary duty, and fraudulent conveyance of the building. Appellees brought a counterclaim for breach of contract seeking the amount of fees they had paid WIP under the AMA.

Prior to trial, the trial court granted summary judgment for appellees on WIP's claim for breach of the Letter Agreement. Because the AMA clearly provided that no fees would be paid after WIP was terminated, WIP attempted to establish in the trial court that the AMA was void or, alternatively, otherwise ineffective to cancel the Letter Agreement, which also mentioned the payout but without the termination condition. However, the trial court found that the Letter Agreement was canceled based on the plain language of the

AMA's "Integration Clause" and that WIP's arguments to the contrary lacked merit.

The remaining claims went to trial before a jury. At the close of appellant's case, WIP moved for judgment as a matter of law on appellees' counterclaim. The trial court reserved ruling on the motion and submitted the claim to the jury. WIP also tendered several nonstandard jury instructions, all of which the trial court rejected. The jury returned a verdict for appellees on all of WIP's claims and awarded appellees $636,000 on their counterclaim. The trial court also granted appellees' motion to add prejudgment interest to its award.

On appeal, WIP challenges these and other rulings of the trial court. We address each of WIP's contentions in turn, supplementing our discussion with further facts where relevant.

## II. DISCUSSION

### A. *Summary Judgment*

WIP first challenges the trial court's grant of summary judgment to appellees on WIP's breach of contract claim based on the 2003 Letter Agreement. The trial court found that there was no issue of material fact that would allow WIP to prevail on a breach of contract claim on the Letter Agreement because the AMA, "signed by WIP and containing an integration clause, explicitly terminated the Letter Agreement." The trial court further found that "none of the arguments made by [WIP] to disavow the termination of the Letter Agreement [were] meritorious." Specifically, WIP argues that the trial court erred by relying on the language of the AMA because: (1) the AMA's integration clause is inoperative to extinguish the rights WIP had under the Letter Agreement; (2) the AMA is void for lack

of consideration; and (3) the AMA is voidable because of fraud in the inducement. We disagree and therefore affirm.

■ In reviewing a trial court order granting a motion for summary judgment, we "conduct[ ] an independent review of the record, and appl[y] the same standard of review used by the trial court in the first instance." *Sherman v. District of Columbia*, 653 A.2d 866, 869 (D.C.1995) (citations omitted). To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating, based on the pleadings, discovery, and any affidavits submitted, that there is no genuine issue as to any material fact and that it is therefore entitled to judgment as a matter of law. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C.2001). The trial court views the record in favor of the non-moving party and may grant the motion only if a reasonable juror, having drawn all inferences in favor of the non-moving party, could not find for the non-moving party under the appropriate burden of proof. *New Places, Inc. v. Communications Workers of Am., Inc.*, 619 A.2d 73, 75 (D.C.1993).

1. *Whether the AMA's "Integration Clause" Canceled the Letter Agreement*

WIP attacks the "Integration Clause," arguing that this section of the AMA is ineffective to terminate the Letter Agreement. We are satisfied, however, based on the plain language of the AMA which explicitly extinguishes WIP's rights under the Letter Agreement, that the trial court did not err.

■ We have held that where a contract's "language is clear and unambiguous, its plain language is relied upon in determining the parties' intention." *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 998 (D.C.2000). Moreover, where a contract contains language releasing another party from its obligations under a different contract, "we must rely solely upon its language as providing the best objective manifestation of the parties' intent," and "where the terms of the document leave no room for doubt, [its] effect ... can be determined as a matter of law." *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C.1984).

■ The integration clause in the AMA reads:

[The AMA] embodies the entire understanding of the parties hereto with respect to the subject matter hereof.... Without limiting the foregoing, *that certain letter agreement, dated October 8, 2003, between the Asset Manager and Global Securities House is hereby terminated,* and the Asset Manager agrees that it shall submit no further claim for the payment of any compensation or other amounts thereunder.

(Emphasis added). This language expressly refers to the Letter Agreement and the parties thereto and unambiguously terminates WIP's rights thereunder. Accordingly, summary judgment on WIP's breach of contract claim based on the Letter Agreement was proper.

Neither of WIP's arguments that the AMA's language is inoperative to cancel the Letter Agreement has merit. First, focusing on the integration clause's reference to "the subject matter hereof," WIP argues that the two contracts concerned different subject matter, and therefore the AMA could not affect the Letter Agreement.[3] However, the extent of WIP's at-

---

**3.** WIP cites no binding authority for this proposition and supports its argument with

only the general proposition, drawn from *Wattenberg v. Wattenberg*, 277 A.D.2d 69, 716

tempt to distinguish the subject matter of the two agreements is to conveniently italicize certain phrases in the Letter Agreement, but not similar phrases in the AMA. WIP goes on to recite provision after provision of the Letter Agreement, but does not distinguish this language from similar language in the AMA, or account for the contemplation of the AMA itself within the Letter Agreement. The Letter Agreement covers "the purchase of the Building, its ongoing management, its refinancing or sale and the compensation to be paid to WIP and the Asset Manager in connection therewith." These are precisely the same subjects of the AMA at issue in this litigation, as the AMA sets forth in detail the duties and compensation of WIP in its management of the building. Moreover, as explained earlier, the Letter Agreement expressly contemplated the negotiation of a second agreement, the AMA, by the parties. Accordingly, nothing about the subject matter of the agreements undermines the effect of the AMA's integration clause.

Second, WIP argues that the two agreements were signed by different companies, and therefore the AMA, signed by TBC, cannot effectively amend the terms of the Letter Agreement which, according to its language, could only be amended by a writing signed by GSH and WIP. This argument might have some force and effect if WIP by signing the AMA had not specifically agreed to terminate the Letter Agreement and release all claims it had to compensation thereunder. Here, it matters only that the AMA was "executed by the party against whom it is sought to be enforced," *GLM P'ship, supra,* 753 A.2d at 998, and its language terminating WIP's

rights is clear. *See also Bolling, supra,* 475 A.2d at 385 (contract, executed by adversary, providing that party was released from liability for "all claims of any kind," acted as valid release of all claims).

Accordingly, it was not error for the trial court to rely on the plain language of the AMA's integration clause in granting summary judgment to appellees. We turn now to WIP's assertions that the entire AMA was invalid due to a lack of consideration and, alternatively, fraud in the inducement.

### 2. *Lack of Consideration*

WIP's contention that the entire AMA was void for lack of consideration is without merit. WIP asserts that because appellees were already obligated under the Letter Agreement to perform the acts the AMA required, there was no new consideration for the AMA. In support of this argument, WIP relies on *Sloan v. Sloan,* 66 A.2d 799, 800–01 (D.C.1949), a case binding on this court which held that a "promise to do a thing which the promisor is already bound to do is not a good consideration upon which to found another promise." However, because we are satisfied that the AMA was supported by its own valid consideration, we find no merit to WIP's argument.

In determining whether a valid contract exists, we "will not inquire into the adequacy of" consideration, even where it is "arguably slight," as long as it is "legally sufficient." *Riggs v. Aetna Ins. Co.,* 454 A.2d 818, 821 (D.C.1983). "An exchange of promises" or a "detriment to the promisee" constitutes legally sufficient consideration, "so long as it is bargained-

N.Y.S.2d 383, 383 (N.Y.App.Div.2000), that a "very general merger clause" contained in one agreement between two parties does not serve to terminate prior agreements between the parties concerning different subject mat-

ter. This proposition is inapplicable here where the AMA very specifically refers to the Letter Agreement and unambiguously states that it is terminated.

for." *Pearsall v. Alexander*, 572 A.2d 113, 118 (D.C.1990) (citing RESTATEMENT (SECOND) OF CONTRACTS § 75 (1932)).

 Such an exchange exists in this case. In the Letter Agreement, WIP promises to convey Transpoint, and appellees promise to pay acquisition fees and negotiate an AMA with WIP. In the AMA, WIP promises to perform as Asset Manager, and appellees promise to pay asset management fees. WIP bargained for and received several other rights under the AMA that were not granted by the Letter Agreement alone such as: the right to indemnity, the right to an incentive fee, and the right to reimbursed expenses. WIP does not dispute that the foregoing benefits and detriments were bargained for and exchanged, nor has WIP shown how they are legally insufficient under our authorities.[4] Thus WIP has failed to show that the AMA lacked consideration.

### 3. *Fraud in the Inducement*

We likewise find no merit in WIP's last challenge to the trial court's reliance on the AMA in granting summary judgment on its Letter Agreement claims. WIP claimed that it was fraudulently induced into signing the AMA and thus the AMA is voidable[5] and the Letter Agreement still governs. Specifically, WIP alleged that appellees falsely led WIP to believe that they needed 100% ownership of Transpoint to comply with Shari'ah law and that the payout fee was unconditionally guaranteed to WIP regardless of whether WIP was terminated. The trial court found that "either both agreements were fraudulently induced, in which case [WIP] cannot pursue a breach of contract claim [on the Letter Agreement]," or "neither was fraudulently induced." Despite the parties' confusion as to the import of the trial court's language,[6] we conclude that WIP has raised no genuine issue of material fact upon which it could prove that the AMA was fraudulently induced.[7]

 We have time and again imposed a "very high standard" on sophisticated business entities[8] claiming

4. Moreover, both parties alleged below that they performed under the AMA and WIP accepted fees pursuant to the AMA without protest—fees WIP would not have received under the Letter Agreement by itself. These reasons further support our conclusion that the AMA was a "fully executed" agreement supported by valid consideration. *See Sloan, supra,* 66 A.2d at 801 ("[P]erformance either partial or in full supplies a sufficient consideration."); *Clark v. Clark,* 535 A.2d 872, 877 (D.C.1987) ("Mr. Clark paid and Mrs. Clark received alimony payments at the modified levels without protest, and hence the modifications would no longer fail for lack of consideration.").

5. *See Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 94, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) ("[F]raud in the inducement ... renders the note voidable but not void.").

6. Although both parties expressed confusion about the trial court's statement that either

both agreements were fraudulently induced, or neither were fraudulently induced, we take this statement to mean that WIP has failed to show a material issue of fact peculiar to its signing of the AMA—separate from the Letter Agreement negotiations—that could support a claim of fraud in the inducement. The alleged fraudulent misrepresentations, *i.e.,* the need for 100% ownership and the nature of the disposition fee, were both discussed prior to inking the Letter Agreement.

7. To avoid summary judgment on this basis, WIP must identify a genuine issue of material fact upon which it could prevail at trial under the appropriate burden of proof, *New Places, supra,* 619 A.2d at 75, which is "clear and convincing evidence" in fraud claims. *Virginia Acad. of Clinical Psychologists v. Group Hospitalization and Med. Servs., Inc.,* 878 A.2d 1226, 1233 (D.C.2005).

8. It is undisputed that WIP and appellees and their principals are sophisticated business en-

fraudulent inducement in arms-length transactions. *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 931–33 (D.C. 1992). It is fundamental that in "a business transaction between two sophisticated entities involving substantial sums," as was this transaction, "parties are bound by what they sign." *GLM P'ship, supra,* 753 A.2d at 999. Thus our decisions state clearly that to prevail such "a plaintiff claiming fraud must establish by clear and convincing evidence" that the defendant made a "false representation, in reference to material fact, with knowledge of its falsity, and an intent to deceive," and that the plaintiff's "reliance [on the alleged material misrepresentations] *was reasonable." Williams v. District of Columbia,* 902 A.2d 91, 94 & n. 4 (D.C.2006) (emphasis in original) (citations omitted). Even if "representations are false or misleading, it is unreasonable for a party to rely on those representations if the party had an adequate opportunity to conduct an independent investigation and the party making the representation did not have exclusive access to such information." *Drake v. McNair,* 993 A.2d 607, 622 (D.C.2010).

We are satisfied that WIP has alleged no set of facts that would show it was fraudulently induced into signing the AMA. While WIP claims it was induced by representations that appellees needed 100% ownership of Transpoint to comply with Shari'ah law and that the payout fee was unconditional, it is unclear how the former was even an "inducement" in the first place,[9] and the latter is expressly contradicted in the AMA itself, which states that no further fees will be paid after WIP's termination. WIP had the opportunity to thoroughly investigate the veracity of both of these representations at the time they were made, *see Drake, supra,* 993 A.2d at 625, and, importantly, neither of these representations upon which WIP claims to have relied appear in the contract. Both parties were represented by counsel, and "[e]ach side presumably had the opportunity to make a variety of representations, promises, and offers ... [and] could have conditioned its agreement on the explicit inclusion of those representations in the contract." *Hercules, supra,* 613 A.2d at 932. Consequently, WIP "cannot now be heard to complain that it was ... fraudulently induced into agreeing" to the AMA by appellees' representations because its beliefs as to those aspects of the agreement were not reflected therein. *Id.* at 933 n. 24. "[O]nce [WIP] signed its name to an instrument which did not contain the assurances which it says it considered critical, it must be precluded ... from thereafter claiming that those representations ... support a claim of fraudulent inducement." *Id.* at 931; *see also Drake, supra,* 993 A.2d at 624 ("When a written contract contains an incorporation clause, any alleged prior representations that a party will or will not do something in the future that are not included in that written contract generally do not support a fraud-in-the-inducement

---

tities. For example, Steve Norris of WIP, the signatory on the AMA, holds a J.D. and an L.L.M. in taxation and co-founded a real estate investment company in the District of Columbia with $20 billion in revenues during his tenure.

9. We strain to see how appellees' alleged representations about their need for 100% own-

ership, true or untrue, would serve as an "inducement" as we understand the term. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "inducement" as "[t]he act or process of enticing or persuading another person to take a certain course of action"). If anything, such a prospect would seem to be an impediment, rather than an inducement, to agreeing to a deal.

claim."). Thus, even assuming that appellees made the representations WIP alleged, WIP could not prove fraud in the inducement of the AMA, and summary judgment based on the AMA's language was therefore appropriate.

Having found no error in the trial court's conclusion that WIP could not prevail as a matter of law on its breach of contract claim based on the Letter Agreement, we affirm the trial court's grant of summary judgment.

## B. *Jury Instructions*

We are similarly unpersuaded by WIP's contention that the trial court erroneously instructed the jury. At trial, WIP proposed non-standard jury instructions on the issues of joint venture, breach of fiduciary duty damages, and fraud on the theory that appellees entered into the contracts with no intention to perform, and that the parties' agreements created a joint venture that established fiduciary duties that appellees breached, entitling WIP to disgorgement of appellees' profits. The trial court rejected each proposed instruction and read the respective standard instructions instead. We affirm.

▮ A "party is entitled to a jury instruction upon the theory of the case if there is sufficient evidence to support it." *George Washington Univ. v. Waas*, 648 A.2d 178, 183 (D.C.1994). In deciding whether a proposed instruction on a party's theory of the case was properly denied, we review the record in the light most favorable to that party. *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997). A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, "considered as a whole, fairly and accurately states the applicable law." *Psychiatric Inst. of Wash-*

*ington v. Allen*, 509 A.2d 619, 625 (D.C. 1986). "The accuracy of a jury instruction presents a question of law that is reviewed *de novo*." *Brown v. United States*, 881 A.2d 586, 593 (D.C.2005). Ultimately, "error in denying an instruction can be harmless" if we can conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Dennis v. Jones*, 928 A.2d 672, 676 (D.C.2007) (internal citations omitted). Discussing each in turn, we find no reversible error in any of the challenged instructions.

### 1. *Joint Venture Instruction*

We turn first to the proposed joint venture instruction. WIP requested an instruction that: "Under District of Columbia law, ... [j]oint control over decision-making is not required for the creation of a joint venture." The trial court rejected that instruction and delivered the following instructions, in relevant part:

> You may find ... a joint venture ... only if you find all of the following statements to be true: ... (4) that under that agreement each member had the equal right to direct and control the management of the enterprise.... The joint venture or joint enterprise relationship does not arise accidentally. The members must have the intent to form the relationship.

On appeal, WIP takes issue with the trial court's requirement that the jury find the parties had "equal right to ... control" the enterprise. We are not convinced that the court's instruction was erroneous, but even if it were, we would find that any such error was harmless.

▮ Relying on *Fraser v. Gottfried*, 636 A.2d 430, 432 n. 6 (D.C.1994), WIP asserts that it was reversible error for the

court to require the jury to find equal "control" in order to find a joint venture because, WIP argues, equal control is not necessary. This argument misreads the import of the words in the trial court's instruction. We have consistently mentioned "equal right to control" in our joint venture cases: even in *Fraser, supra,* we described "joint control of decisionmaking" as a "customary attribute" and a "necessary guidepost" of the joint venture inquiry, *id.* at 432,[10] and in *Beckman v. Farmer,* we noted that "a right of joint control is ordinarily key to" finding a joint venture. 579 A.2d 618, 627 (D.C.1990). Although in *Beckman, supra,* we noted that one joint venturer may cede actual control of the business to his associate, this is not to be taken out of context to mean that equal right to control is not required by our law. We clarified in *Beckman, supra,* that when the "power to manage and control" is ceded, the "question then becomes whether or not the participant *had* the right to exercise control: [and thus the right to cede such control] in the management of the business." *Id.* at 628 (emphasis added). This right flows from each joint venturer's original co-ownership of the enterprise. *See id.* at 628 n. 8 (citing D.C.Code § 41.151.1(7) (defining partners as "co-owners [of] a business")); UNIFORM PARTNERSHIP ACT 1914 § 6 ("Ownership involves the power of ultimate control. To state that partners are co-owners of a business is to state that they each have the power of ultimate control.").[11] Thus, although we have held that equal *actual* control is not necessary, we have consistently stated that equal *right* to control is "necessary" and "key."[12] Therefore, because the instruction discussed "equal *right* to direct and control," we can conclude that it "fairly and accurately state[d] the applicable law" and thus was not erroneous. *Psychiatric Inst., supra,* 509 A.2d at 625. The jury simply decided against WIP on this particular issue.

 Moreover, even assuming that the court erred in denying WIP's instruction—which we in no sense suggest that it did—we would still affirm because we conclude that the judgment was not substantially swayed by the alleged error. *See Dennis, supra,* 928 A.2d at 676 (internal citations omitted). The court instructed the jury that "[t]he members must have the intent to form the relationship." The "intent" element of joint venture is well-established.[13] Taking the parties' unam-

---

10. Although we stated in *Fraser, supra,* that none of the "necessary guideposts" of the joint venture inquiry is "conclusive," 636 A.2d at 432, this does not mean that joint right to control is unnecessary. To the contrary: it suggests that equal right to control is necessary, but not always sufficient.

11. We have acknowledged that "[s]trictly speaking, a joint venture is not the same as a partnership, but there is very little law applicable to one that does not apply to the other. Principles of partnership law, in particular the Uniform Partnership Act, apply in most instances to joint ventures." *Jonathan Woodner Co. v. Laufer,* 531 A.2d 280, 285 (D.C. 1987) (quotations omitted).

12. Several other jurisdictions similarly require equal right to control, as reflected in standard instructions from Florida, Minnesota, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, Tennessee, and Virginia, *see generally* REST. (SECOND) TORTS § 491 cmt. C (1965); Washington, *see Paulson v. Pierce County,* 99 Wash.2d 645, 664 P.2d 1202, 1208 (1983); Louisiana, *see Whalen v. Murphy,* 943 So.2d 504, 507 (La.Ct.App.2006); Delaware, *see Warren v. Goldinger Bros., Inc.,* 414 A.2d 507, 509 (Del.1980); and California, *see Myrick v. Mastagni,* 185 Cal.App.4th 1082, 111 Cal.Rptr.3d 165, 172 (2010).

13. *See, e.g., Beckman, supra,* 579 A.2d at 628 (a joint venture "turn[s] less on the presence or absence of legal essentials than on the intent of the parties gathered from their agreement, conduct, and the circumstances surrounding their transactions"); *Fraser, su-*

biguous agreement as "the best objective manifestation of the parties' intent," as we must, *see Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C.2009), it is apparent that no joint venture was intended here. The AMA states clearly, "this Agreement is not intended to create, and does not constitute or result in, a partnership or joint venture of any kind...."[14] In the face of this language, WIP could not prove a shared intent to form a joint venture—at best, the record reflects WIP's unrequited desire to do so. Therefore, even assuming error as to the issue of control, we can be at least "fair[ly] assur[ed]" that the result would be the same and therefore affirm. *See Dennis, supra,* 928 A.2d at 676.[15]

### 2. *Fraud Instruction*

█ We also find no merit in WIP's challenge to the trial court's jury instruction on fraud. WIP proffered the instruction: "A promise or contractual commitment is fraudulent if, at the time of its making, the promisor has no present intention of carrying it out.... A representation as to future events is considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform." The trial court delivered the following instructions:

> For the maker of a statement to be liable for fraud, the maker must have known or believed that the statement was false.... Intent to deceive means that the maker of the statement must have specifically intended that the representation be made, that it be made to the person who actually received it, that it should convey a certain meaning, that it be believed ... [and] acted upon in a certain way.... Intent ordinarily cannot be proved directly, because there is no way to look inside another's person's mind, but you may infer intent from the surrounding circumstance.

The trial court rejected WIP's instruction because it found it was "covered in the other instructions." We agree with this conclusion.

█ The "refusal to grant an instruction is not grounds for reversal when the charge as given, although in a more gener-

---

pra, 636 A.2d at 432 ("[T]he fundamental issue is one of intent."); *see also* 11 WILLISTON ON CONTRACTS § 30:11 at 139 (4th ed. 1999).

**14.** At oral argument, counsel for WIP conceded that this express language disclaims joint venture, but went on to argue that a joint venture was formed during and persisted after the parties' initial negotiations. But if WIP believed the parties' to be partners all along, it cannot explain why it signed an agreement clearly stating the opposite and extinguishing any other agreements.

**15.** Under these same standards, we reject WIP's argument that the trial court erred in refusing to deliver a disgorgement damages instruction. WIP requested that the trial court instruct the jury on its disgorgement theory of damages that, "[i]f you find that [appellees] have breached a fiduciary duty to WIP, you may award them damages equal to the benefit that the [appellees] obtained by breaching their duty." But, even assuming without deciding that the trial court erred,

such an error would be harmless. The jury found that the parties were not in a joint venture in the first instance, and thus owed no fiduciary duties to one another. With no finding of a fiduciary duty, the jury could not have awarded disgorgement damages even under WIP's proposed instruction. Because the outcome was not swayed by the trial court's actions, its rejection of the instruction provides no ground for reversal. *See Dennis, supra,* 928 A.2d at 676.

WIP asserts that it is impossible to determine whether the jury might have found liability had its proposed instruction been given. We disagree. WIP's view would mean a damages instruction would have somehow influenced the jury's finding on the elements of liability. Because we presume that juries follow the instructions of the trial court as given, *see, e.g., Harris v. United States,* 602 A.2d 154, 165 (D.C.1992), we do not entertain WIP's speculation.

al form, fully informs the jury as to the law." *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 688 (D.C.1977). In *Wingfield,* we rejected the appellant's challenge to a general standard jury instruction in lieu of her detailed proposed instruction because the "substance" of the proposed instruction was covered by the general instruction. We have often defined fraud consistent with the given instruction: (1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) upon which action is taken in reliance.[16] *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.1977). WIP's instruction reflects merely one specific way—albeit tailored to its claims in this case—that one can commit fraud. If a jury had found that appellees had no intention to perform when they executed the AMA, they would necessarily have found that appellees signed the contract knowing its affirmation to be false and intending WIP to rely on it through performance. Applying *Wingfield, supra,* therefore, we are confident that the jury was adequately informed on the law of fraud and simply decided against WIP's particular theory on the issue.[17]

For these reasons, we conclude that the trial court did not err in its instructions to the jury.

### C. Motion for Judgment on Counterclaim

We turn now to WIP's contention that the trial court erred when it did not grant WIP's motion, at the close of all the evidence, for judgment on appellees' counterclaim. The trial court reserved ruling on WIP's pre-verdict motion and allowed the counterclaim to go to the jury, which found against WIP. WIP now asserts that it was error not to grant the motion. However, that claim is now waived because WIP failed to renew its motion for judgment within ten days after entry of judgment under Super. Ct. Civ. R. 50(b). *See Vuitch v. Furr,* 482 A.2d 811, 813 n. 2 (D.C.1984) ("Appellants did not make a motion for judgment notwithstanding the verdict [under] Super. Ct. Civ. R. 50(b), and therefore, this court is without power to direct entry of a judgment for appellants as they request."); *see also Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.,* 546 U.S. 394, 400–01, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006) (reversing the grant of a new trial by the appellate court because the appellant failed at trial to properly renew his motion for judgment under FED.R.CIV.P. 50(b) after the verdict).[1819]

---

**16.** And, as between sophisticated parties, we also require proof that the plaintiff's reliance be reasonable. *See Williams, supra,* 902 A.2d at 94.

**17.** Moreover, any error in the court's fraud instruction would be harmless because the jury affirmatively found that it was WIP, not appellees, that breached the agreement.

**18.** The Supreme Court held in *Unitherm,* regarding Fed.R.Civ.P. 50(b), that "in the absence of such a motion an appellate court is without power to direct the [trial court] to enter judgment contrary to the one it had permitted to stand." 546 U.S. at 400–01, 126 S.Ct. 980 (quotations omitted). We construe

our rules in light of the meaning of the federal rules where they are substantially identical, *see Taylor v. Washington Hosp. Ctr.,* 407 A.2d 585, 590 (D.C.1979), as is Rule 50(b). *See Marcel Hair Goods Corp. v. National Sav. & Trust Co.,* 410 A.2d 1, 4 (D.C.1979) ("Super.Ct.Civ. R. 50(b) ... is identical to the federal rule.").

**19.** Even if we were to address WIP's challenge to the sufficiency of the evidence as to the amount of damages, we would find no error by the trial court. To be successful, challenges to the amount of damages must show that the jury could only speculate based on the record. *See, e.g., Sastry v. Coale,* 585

D. *Prejudgment Interest*

WIP next challenges the trial court's decision to add prejudgment interest to appellees' counterclaim award pursuant to D.C.Code § 15–108.[20] This challenge lacks merit.

 Because of the remedial nature of prejudgment interest, the award "will not be upset on appeal absent an abuse of discretion." *Warren v. Chapman*, 535 A.2d 856, 863 (D.C.1987); *see also General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). We have instructed that "the court has ample discretion to include prejudgment interest ... if necessary to fully compensate the plaintiff" and "[t]he court usually should award [prejudgment interest] in such cases 'absent some justification for withholding such an award.'" *Federal Mktg. Co. v. Virginia Impression Prods. Co.*, 823 A.2d 513, 531–32 (D.C.2003) (quoting *General Motors Corp., supra*, 461 U.S. at 657, 103 S.Ct. 2058); *see also District Cablevision Ltd. v. Bassin*, 828 A.2d 714, 732 (D.C.2003) ("Statutes providing for prejudgment interest ... should be generously construed so that the wronged party can be made whole.") (quotations omitted).

 Prejudgment interest will be awarded on a judgment as long as the judgment is: (a) for a liquidated debt (b) payable by usage.[21] *See District Cablevi-*

sion, *supra*, 828 A.2d at 731. As used in the statute, the term "debt" is given a "broad reading," *Bragdon, supra*, 856 A.2d at 1169 n. 6, and describes an amount of money the use of which a prevailing plaintiff has been deprived by the defendant's conduct. *Federal Mktg. Co., supra*, 823 A.2d at 532. A debt is "liquidated" if it is an easily ascertainable, certain sum of money. *See Bassin, supra*, 828 A.2d at 731 (defining a "liquidated debt" as "an easily ascertainable sum certain" that compensates a "creditor for the loss of use of money that a debtor wrongfully withholds"). "Payable by usage" refers to "what is customary or usual under similar or comparable circumstances," such as "where such interest had been held to be recoverable in a case which was viewed as analogous in principle." *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1255 (D.C.1990).

 The trial court did not err in awarding prejudgment interest. The trial court concluded that WIP's "liability stems from an explicit promise on the part of [appellees] to pay to [WIP] a sum certain in fees under the AMA," and that the asset management fees were similar to "an overpayment," given WIP's nonperformance under the contract. Although WIP takes issue with certain aspects of the trial court's reasoning underlying the award, WIP has provided no persuasive "justifica-

A.2d 1324, 1328 (D.C.1991). A plaintiff is not required to prove a precise amount; rather, he must establish the fact of damage and a reasonable estimate as to the amount. *See Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991). Appellees presented undisputed testimony regarding the amount of fees they paid to WIP (about $636,000) and the amount of extra work required due to alleged failures in WIP's performance. Because appellees showed the fact of damage and a reasonable basis upon which to estimate an award, we find no error here.

**20.** Section 15–108 reads in pertinent part: "In an action ... to recover a liquidated debt on which interest is payable by contract or by law or by usage, the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable...."

**21.** Because the trial court found that the debt in this case was "payable by ... usage," we need not discuss the other grounds by which prejudgment interest may be payable, *i.e.*, "by contract or by law."

tion for withholding such an award," *see Federal Mktg. Co., supra,* 823 A.2d at 532, and we discern none from our review of the record. The jury found that WIP had retained fees from appellees for services it had not rendered, and thus the trial court properly considered those fees a "debt" under the "broad reading" courts give the term. *See Bragdon, supra,* 856 A.2d at 1169 n. 6.[22] Both parties knew exactly how much WIP had been paid under the AMA, and thus appellee's award was a "sum certain." *See Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293, 1302 (D.C. 1979) ("[I]t would be somewhat artificial to find the debt unliquidated where ... the defaulting party[ ] knew the exact amount and terms of the contractual debt.").[23] Further, in *Bragdon, supra,* 856 A.2d at 1169, we awarded prejudgment interest on an "overpayment," thus the debt here has been "held to be recoverable in a case ... analogous in principle." *Riggs Nat'l Bank, supra,* 581 A.2d at 1255.[24] Accordingly, the trial court properly found that appellees' counterclaim award was a "liquidated debt ... payable ... by usage," and thus did not abuse its discretion in awarding prejudgment interest.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Superior

---

**22.** WIP relies selectively on our dictum in *Bragdon v. Twenty-Five Twelve Associates Limited Partnership, supra,* that the nature of an overpayment as a "debt" is "not self-evident, since the liability for the overcharges did not stem from an explicit promise to pay such an amount." 856 A.2d 1165, 1169 n. 6 (D.C. 2004). However, the full text of the footnote reads that the liquidated nature of an overcharge is "not self-evident.... *However, we have given the term 'debt' a broad reading." Id.* (awarding prejudgment interest) (emphasis added). Moreover, here, the trial court found that WIP's liability stemmed from an explicit promise to pay, and thus WIP's reliance is misplaced.

**23.** We reject WIP's assertions that appellees' award was rendered uncertain and thus not "liquidated" due to: (a) the value of WIP's performance and (b) appellee's amendment of the amount of its requested damages. To be sure, a debt is not liquidated if it would not be a "sum certain until after the jury returned its verdict." *Pierre Equip. Co. v. Griffith Consumers Co.,* 831 A.2d 1036, 1041 (D.C.2003); *District of Columbia v. Campbell,* 580 A.2d 1295, 1301 (D.C.1990) (a debt is unliquidated if it is "the subject of controversy and proof at trial"). But, it is "well-settled" that "the existence of an unliquidated ... set-off," like the amount WIP argued that it was owed for its performance, "does not render the claim itself uncertain or deprive the claimant of the right to prejudgment interest." *Giant Food, supra,* 399 A.2d at 1300 n. 10 (sum "liquidated" "[e]ven where a bona fide dispute exists as to a debt"); *see also Bassin, supra,* 828 A.2d at 732 (plaintiff entitled to prejudgment interest even if recovery is reduced at trial by some amount plaintiff owes defendant). Moreover, the fact that the total amount of damages that appellees sought changed during trial did not affect the "liquidated" nature of appellees' breach of contract claim because the changes in total amount were due to adding or subtracting other classes of damages, while the breach of contract amount remained unchanged. *See Hartford Accident & Indem. Co. v. District of Columbia,* 441 A.2d 969 (D.C. 1982) (unpaid balance on a contract that fluctuated throughout trial was unliquidated, while other classes of damages that were certain from the outset were liquidated).

**24.** WIP contends that the counterclaim damages were actually for restitution and thus not payable "by usage" since we have not stated explicitly that prejudgment interest is payable in restitution claims. Even assuming we accept WIP's characterization, the D.C. Circuit has held that "[t]here is no doubt that the district court may award prejudgment interest on funds that are to be paid over as restitution," *Frederick Cnty. Fruit Growers Ass'n v. Martin,* 968 F.2d 1265, 1275 (D.C.Cir.1992), and all that is required to render a debt payable by usage is that it has been held recoverable in analogous, comparable, or similar cases. *See Riggs, supra,* 581 A.2d at 1255. WIP cites no contrary authority.

Court.[25]

*So ordered.*

**In re Brian J. COLOMBANA,
Respondent.**

**No. 11–BG–518.**

District of Columbia Court of Appeals.

Filed Sept. 15, 2011.

Before OBERLY, Associate Judge;
TERRY and KING, Senior Judges.

**25.** Counsel for WIP raised several other issues on appeal which require little or no discussion and thus can be disposed of summarily. We are satisfied that the trial court did not err in failing to specifically instruct the jury as to WIP's breach of fiduciary duty claim at the beginning of trial because the trial court's charge, considered as a whole, fairly stated the law that applied to the case. *See Psychiatric Inst., supra,* 509 A.2d at 625.

The trial court did not err in admitting evidence that WIP's termination was also justified by its failure to secure a new lease for Transpoint because excluding the evidence would have required the trial court to resolve several disputed issues of material fact regarding frustration and each party's performance. *See* 11 WILLISTON ON CONTRACTS § 39.3 (4th ed. 2009) (disputed issues such as whether "interference by one party" excuses performance are proper questions of fact for the jury).

The trial court did not abuse its discretion when it refused to compel Fahed Boodai to testify in WIP's case-in-chief because WIP had ample opportunity prior to trial to secure his attendance at trial and could have, but chose not, to read his deposition testimony into the record. *See Mbakpuo v. Ekeanyanwu,* 738 A.2d 776, 782 (D.C.1999) (no abuse of discretion in refusing to compel witness to testify where appellant gave no prior notice of intent to call witness to the stand despite ample opportunity to designate witness).

Further, the trial court did not abuse its discretion in refusing to deliver a "missing witness" instruction as to Fahed Boodai because WIP failed to provide the requisite basis for its entitlement to such an instruction. *See McPherson–Corder v. Chinkhota,* 835 A.2d

1081, 1086 (D.C.2003) (discussing this and other courts' aversion to the instruction and stating that it is seldom an abuse of discretion to deny it). Accordingly, the trial court also properly prohibited WIP from using the rhetorical question, "where's Fahed?" to suggest an adverse inference from Fahed Boodai's absence. *See Battocchi v. Washington Hosp. Ctr.,* 581 A.2d 759, 768–69 (D.C.1990) (counsel may not ask rhetorical questions that invite the jury to make a negative inference about a witness's non-appearance when the court has denied a request for a missing witness instruction and argument).

The trial court properly limited WIP's cross-examination of Ayman Boodai to the scope of his direct testimony because "the reach of cross-examination is delimited by the scope of direct examination." *Hart v. United States,* 538 A.2d 1146, 1148 (D.C.1988). Moreover, the trial court did not err in failing to compel Ayman Boodai to testify in WIP's rebuttal case because WIP failed to provide a sufficient justification for its failure to introduce this evidence in its case-in-chief. *See Cooper v. Safeway Stores, Inc.,* 629 A.2d 31, 35 (D.C.1993).

Finally, the trial court properly exercised its broad discretion in refusing to limit appellees' rebuttal closing arguments because WIP did not allege that appellees' argument would "misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury," *Smith v. United States,* 330 A.2d 519, 521 (D.C.1974) (quotation omitted), and WIP has failed to demonstrate prejudice from appellees' arguments. *See Scott v. Crestar Fin. Corp.,* 928 A.2d 680, 689–90 (D.C.2007).