*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CV-462, 18-CV-493, & 18-CV-697

IRON VINE SECURITY, LLC
AND
SECOND FACTOR, INC., APPELLANTS/CROSS-APPELLEES,

V.

CYGNACOM SOLUTIONS, INC., APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAB-855-16)

(Hon. Marisa J. Demeo, Motions Judge;
Hon. Hiram Puig-Lugo, Trial Judge)

(Argued June 17, 2020                    Decided May 12, 2022)

*Terrell N. Roberts, III* for appellant/cross-appellee Iron Vine Security, LLC.

*Barry Coburn*, with whom *Kimberly Jandrain* and *Marc Eisenstein* were on the brief, for appellant/cross-appellee Second Factor, Inc.

*Robert J. Wagman, Jr.*, with whom *David M. Hibey* was on the brief, for appellee/cross-appellant Cygnacom Solutions, Inc.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and EPSTEIN, *Associate Judge of the Superior Court*.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

GLICKMAN, *Associate Judge*:   Following a jury trial in Superior Court on claims for breach of contract, tortious interference with business relations, and conspiracy to commit such tortious interference, appellee/cross-appellant Cygnacom Solutions, Inc. (Cygnacom) obtained a judgment for compensatory and punitive damages against appellants/cross-appellees Iron Vine Security, LLC (Iron Vine) and Second Factor, Inc. (Second Factor).

In their appeals, Iron Vine and Second Factor raise multiple claims of error. Both appellants contend they were entitled to judgment as a matter of law because the evidence adduced at trial was insufficient in a number of respects to support the judgments entered against them.   Iron Vine further argues that the contractual provisions underlying Cygnacom's causes of action — a provision in Iron Vine's contract with Cygnacom prohibiting either party from soliciting the other party's employees, and a provision in Cygnacom's employment contracts restricting its employees from leaving to work for certain of its competitors — were unenforceable as a matter of law.   And Second Factor argues that lost profit damages awarded against it on Cygnacom's claim of tortious interference must be vacated because they are duplicative of lost profit damages awarded against Iron Vine on Cygnacom's claims of breach of contract and tortious interference.

In its cross-appeal, Cygnacom claims the trial judge erred in dismissing its statutory business conspiracy claim under Virginia law[1] on choice-of-law grounds.

We conclude that nearly all of Iron Vine and Second Factor's claims of error are waived, because Iron Vine and Second Factor either failed to raise them in the trial court at all, or failed to argue them in a post-verdict motion for judgment as a matter of law pursuant to Super. Ct. Civ. R. 50(b).  Of the claims that are reviewable, we find meritorious only Second Factor's contention that Cygnacom is not entitled to a double recovery of lost profits damages on its breach of contract claim against Iron Vine and its tortious interference claim against Second Factor.  As for the cross-appeal, we conclude that the trial court erred in dismissing Cygnacom's Virginia business conspiracy claim.  Accordingly, we remand the case to the trial court for further proceedings consistent with this opinion with regard to the damage award and Cygnacom's Virginia business conspiracy claim, and otherwise affirm the judgment in Cygnacom's favor.

---

[1]  Va. Code Ann. §§ 18.2-499–500 (prohibiting combinations to injure others in their reputation, trade, business or profession, and providing for treble damages and other civil relief).

## I. Factual Background

The controversy in this case revolves around a small but lucrative part of a large United States Department of State contract awarded in 2011 for a period of ten years to Science Applications International Corporation (SAIC). Known as the "Vanguard Contract," this contract consolidated many of the State Department's information technology support needs under one umbrella. In 2011, SAIC subcontracted (also for ten years) some services within the Vanguard Contract's scope to Iron Vine, a Virginia corporation that provides a range of information technology services. SAIC requested that Iron Vine subcontract a portion of that work, involving Public Key Infrastructure (PKI) services, to Cygnacom, which is also a Virginia corporation having its principal place of business in Virginia. Accordingly, in September 2011, Iron Vine and Cygnacom entered into a Master Subcontract Agreement, which we will refer to in this opinion as "the Vanguard Subcontract." Under the Vanguard Subcontract, Cygnacom provided PKI services, utilizing its own employees, pursuant to a separate Statement of Work executed by Cygnacom and Iron Vine. The Vanguard Subcontract was to be automatically renewed each February so long as a Statement of Work remained in effect, unless Iron Vine provided notice to Cygnacom that it did not elect to renew the subcontract.

Cygnacom devoted nine of its employees to its performance under the Vanguard Subcontract. In the negotiation of the parties' working relationship under that subcontract, Cygnacom sought assurance that Iron Vine would not use the opportunity to hire away its employees. Iron Vine agreed to provide such assurance as long as it was mutual. So in Section 9.13 of the Vanguard Subcontract, its "Non-Solicitation Provision," Iron Vine and Cygnacom agreed that unless they "obtained the prior written approval of the other Party," they would not "offer employment to or in any other way directly or indirectly induce any employee of the other Party to terminate his or her employment with the other Party." The provision was "enforceable throughout the performance of the [Vanguard Subcontract]" and was to "survive for twelve (12) months after its termination for any reason."

Cygnacom also had contracts with its employees. These contracts included "Non-Competition Provisions" in which the employees agreed that during their "employment and for a period of one (1) year following [their] termination," they would not "compete against [Cygnacom] by accepting employment with, acting as a consultant to . . . or otherwise providing or agreeing to provide services to or on behalf of any person, employer or other entity that" was either "actively competing against [Cygnacom] for a government procurement" or had "competed against Cygnacom for a government procurement within the last six (6) months."

Raymond Shanley was one of the Cygnacom employees assigned to the Vanguard Subcontract. In 2013, Shanley formed appellant Second Factor, a Virginia corporation, while he still was employed by Cygnacom. Shanley then left Cygnacom's employ in 2014 and, with Cygnacom's consent, Second Factor entered into a subcontract with Iron Vine whereby Shanley continued to provide PKI services to the State Department.

Iron Vine and Cygnacom worked under their subcontract arrangement without incident until 2015. But around that time, SAIC began to have concerns regarding Cygnacom's performance. Iron Vine and Second Factor maintain that SAIC's concerns were legitimate and ultimately led SAIC to ask Iron Vine not to renew its subcontract with Cygnacom and to replace Cygnacom with a different subcontractor. Cygnacom contends Iron Vine fed SAIC misinformation about its performance and fed SAIC's concerns in order to make it easier to oust Cygnacom from the Vanguard project.

Regardless of the validity of SAIC's concerns about Cygnacom, it is undisputed that by December 2015, Iron Vine had begun to make plans to replace Cygnacom on the Vanguard Subcontract. That month, Iron Vine's president, William Geimer, met with Shanley to discuss whether Second Factor could be that

replacement. A December 8, 2015 email memorialized an agreement between Iron Vine and Second Factor to form a new Vanguard "team" to be managed by Shanley. The email identified Cygnacom employees working on the Vanguard Subcontract whom Geimer and Shanley hoped to hire to continue doing that same work for their companies, notwithstanding their knowledge of the restrictions in the Non-Solicitation Provision and the Non-Competition Provision. On the same day, Geimer asked Shanley to "help map" position descriptions for the new roles "with the person currently in the slot" at Cygnacom.

On December 15, 2015, Geimer informed Cygnacom's president that Iron Vine was not renewing the Vanguard Subcontract, meaning Cygnacom's involvement with the project would end on February 8, 2016. Iron Vine and Second Factor posted job descriptions matching those of the Cygnacom employees on the same day. Within three days, Iron Vine offered employment to a Cygnacom employee, Warren Wilbur. Shanley and Second Factor also offered jobs to Cygnacom employees before the Vanguard Subcontract terminated, and Shanley communicated with Iron Vine regarding those offers. Together, the two companies ultimately hired six Cygnacom employees who had worked on the Vanguard Subcontract, with five going to Second Factor and Mr. Wilbur going to Iron Vine. All six resigned from Cygnacom on the same day, January 25, 2016. After the

Vanguard Subcontract ended, Iron Vine and Second Factor assumed control of PKI services to the State Department.  They still were providing those services at the time of trial in 2018.

## II.  Procedural History

In February 2016, Cygnacom sued Iron Vine, Second Factor, and Shanley personally (collectively, "the defendants").  Its complaint, as amended the following month, asserted multiple claims of breach of contract against Iron Vine and Shanley; a claim for breach of the duty of good faith and fair dealing against Iron Vine alone; and claims against all three defendants of tortious interference with Cygnacom's business relationships with its employees, common law civil conspiracy (to commit tortious interference), violation of the Virginia business conspiracy statute, and misappropriation of trade secrets.  The claims centered on the defendants' alleged breaches of, or interference with, the Non-Solicitation Provision in the Vanguard Subcontract and the Non-Competition Provision in Cygnacom's contracts with its employees.

The defendants moved to dismiss Cygnacom's claims, with Iron Vine arguing, *inter alia*, that the Non-Solicitation Provision of the Vanguard Subcontract was unenforceable.  All parties later cross-filed for summary judgment.  The

Superior Court resolved these motions in a single order that dismissed the claim alleging breach of the duty of good faith and fair dealing, granted summary judgment to Shanley on two of the breach of contract claims against him, and denied the motions in all other respects. The parties proceeded to trial on breach of contract claims against Iron Vine,[2] and the tortious interference, common law conspiracy, and statutory conspiracy counts against all defendants.[3]

Cygnacom's theory at trial was that after Shanley obtained the subcontract with Iron Vine, he and Iron Vine began plotting to poach the Cygnacom employees working on the Vanguard Subcontract in order to terminate that agreement and split the PKI services, and the profits therefrom, between Second Factor and Iron Vine. Cygnacom argued that by directly or indirectly (through Second Factor) offering employment to its employees, Iron Vine violated the Non-Solicitation Provision of the Vanguard Subcontract, and that all defendants conspired to and did tortiously

---

[2] Cygnacom brought three separate breach of contract counts against Iron Vine, alleging three separate breaches of the Non-Solicitation Provision: (1) directly offering employment to a Cygnacom employee; (2) indirectly offering employment to a Cygnacom employee; and (3) indirectly inducing a Cygnacom employee to terminate their employment with Cygnacom. These counts, however, were not presented separately to the jury at trial. The verdict form asked only whether the jury found Iron Vine to have breached the Vanguard Subcontract and did not ask them to specify the manner in which Iron Vine breached it.

[3] Cygnacom voluntarily dismissed all other claims prior to trial.

interfere with the employment contracts of the six Cygnacom employees who left the company. Cygnacom claimed these actions proximately caused it to lose five years of future profits on the Vanguard Subcontract, on the premise that, if Iron Vine and Second Factor had not hired away its employees, Iron Vine would not have terminated the Vanguard Subcontract and Cygnacom would have continued to earn profits under it until 2021 (when Iron Vine's subcontract with SAIC was slated to end).

The defendants argued that Iron Vine's nonrenewal of the Vanguard Subcontract was the result of SAIC's dissatisfaction with Cygnacom's performance, that this would have occurred regardless of whether Iron Vine and Second Factor hired Cygnacom's employees, and hence that their actions in hiring those employees were not the proximate cause of any of Cygnacom's lost profits. On that theory, Iron Vine moved for judgment as a matter of law on the breach of contract claims at the close of Cygnacom's case and again at the close of all evidence. Making essentially the identical argument that none of their actions proximately caused Cygnacom's damages and that the claimed damages were "speculative[]" and "unreliabl[e]," all defendants moved for judgment as a matter of law on Cygnacom's other causes of action as well at the close of Cygnacom's case and again before the case was submitted to the jury. The trial judge denied all of these motions.

At the close of evidence, the defendants also moved to dismiss the count charging violation of the Virginia business conspiracy statute on choice-of-law grounds. They argued that any conspiracy Cygnacom had alleged at trial took place primarily in the District of Columbia and necessitated the application of District rather than Virginia law. (There is no comparable statutory cause of action for conspiracy in the District.) The trial judge granted the motion, and the Virginia statutory claim was not submitted to the jury.

The jury returned a verdict on March 16, 2018 in favor of Cygnacom, finding Iron Vine liable for breach of contract, Iron Vine and Second Factor (but not Shanley) each liable for tortious interference, and all three defendants liable for a common law civil conspiracy to tortiously interfere with Cygnacom's business. On both the breach of contract and conspiracy counts, the jury awarded Cygnacom compensatory damages totaling $1,012,011. (Based on the evidence, this figure represented three years of lost profits under the Vanguard Subcontract.) On the tortious interference count, the jury separately awarded compensatory damages of $168,668.59 against Iron Vine, and the same amount against Second Factor. (The sum of those two awards, $337,337.18, equaled Cygnacom's claimed lost profits for one year.) In addition to compensatory damages, the jury assessed punitive damages

in the amounts of $450,000 against Iron Vine and $150,000 against Second Factor. (The jury did not award punitive damages against Shanley.)

In a post-verdict hearing held on April 12, 2018, the parties agreed that the compensatory damages awarded to Cygnacom for conspiracy were duplicative of those awarded for breach of contract. The judge therefore entered judgment for Cygnacom only on its breach of contract and tortious interference claims, and only against Iron Vine and Second Factor (as the jury had found Shanley individually liable only on the conspiracy count).

## III. Discussion

### A. Claims Challenging the Sufficiency of the Evidence

Iron Vine and Second Factor ask us to direct the trial court to enter judgment as a matter of law or award them a new trial because the evidence at trial was insufficient to show that (1) their conduct proximately caused Cygnacom's lost profit damages; (2) the lost profit damages were reasonably certain; (3) Cygnacom, Second Factor, and Iron Vine were "competitors" such that hiring Cygnacom employees constituted tortious interference (i.e. caused the employees to violate their contracts with Cygnacom); (4) Iron Vine and Second Factor "wrongfully" interfered with the Cygnacom employees' contracts; and (5) punitive damages were

warranted. We hold that none of those challenges is preserved for our review, because Iron Vine and Second Factor failed to make all but the first two of them in a Civil Rule 50(a) motion for judgment as a matter of law, and did not renew, per Civil Rule 50(b), any sufficiency challenge post-trial.

In a civil jury trial, the court may, under Rule 50(a), grant a motion for judgment as a matter of law against a party who "has been fully heard on an issue" where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]"[4] Such a motion "may be made at any time before the case is submitted to the jury,"[5] and it must assert "specific claims of evidentiary insufficiency."[6] A party who omits from its motion a particular evidentiary ground is precluded from later raising that theory in a renewed motion for judgment as a matter of law after the verdict or in an appeal.[7]

---

[4] Super. Ct. Civ. R. 50(a)(1).

[5] *Id.* R. 50(a)(2).

[6] *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 904 (D.C. 2008); *see also* Super. Ct. Civ. R. 50(a)(2)("The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.").

[7] *See NCRIC*, 957 A.2d at 904, 906 ("The failure to assert a particular sufficiency challenge in a Rule 50(a) motion precludes consideration of that challenged on appeal. . . . [N]ew grounds may not be asserted in the post-verdict motion"); *see also Howard Univ. v. Best*, 547 A.2d 144, 147 (D.C. 1988).

The Rule 50(a) motion primarily serves to "call the attention of the opposing party to the alleged deficiency in the evidence at a point in the trial where that party may cure the defect."[8] The Rule allows the court to enter judgment as a matter of law, but does not *require* it to do so.[9] "To the contrary, the [trial] courts are, if anything, encouraged to submit the case to the jury rather than granting such motions[,]" in order to avoid the need for an entire new trial when the appellate court determines that the motion was granted in error.[10]

Thus, if the Rule 50(a) motion is not granted, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."[11] A subsequent post-trial renewal of that motion pursuant to Civil Rule 50(b) is essential to allow the trial judge, "who saw and heard

---

[8] *NCRIC*, 957 A.2d at 904 (quoting *Best*, 547 A.2d at 148).

[9] *See* Super. Ct. R. 50(a) ("If . . . the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party . . . the court *may* . . . grant a motion for judgment as a matter of law[.]" (emphasis added)).

[10] *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405–06 (2006). We construe Civil Rule 50 "in light of the meaning" of Federal Rule of Civil Procedure 50, as the two rules are "substantially identical." *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 580 n.18 (D.C. 2011).

[11] Super. Ct. Civ. R. 50(b). The motion for judgment as a matter of law may be renewed no later than 28 days after the entry of judgment. *Id.* The renewed motion may include an alternative or joint request for a new trial under Super. Ct. Civ. R. 59. *Id.*

the witnesses and who has the feel of the case which no appellate printed transcript can impart," to review in the first instance the sufficiency of the evidence as a matter of law.[12] The failure of a party to make a timely post-verdict Rule 50(b) motion renewing its claims that the evidence at trial was legally insufficient constitutes a waiver of those claims and leaves this court "*without power* to direct the trial court to enter judgment contrary to the one it had permitted to stand."[13] We do not require parties to reassert their claims with "technical precision"[14] or even in a written motion; "oral motions, in which a party specifically invokes the rule, or perhaps even colloquy with the court, fulfill the requirements of Rule 50 in some instances."[15] But

---

[12] *Unitherm*, 546 U.S. at 395 (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)); *see also Ortiz v. Jordan*, 562 U.S. 180, 189 (2011) (stating that "[a]bsent . . . a [Rule 50(b)] motion, we have repeatedly held, an appellate court is *powerless* to review the sufficiency of evidence after trial") (emphasis added and internal quotation marks omitted).

[13] *Wash. Inv. Partners*, 28 A.3d at 580 & n.18 (quoting *Unitherm*, 546 U.S. at 400-01) (alterations omitted; emphasis added); *see also Vuitch v. Furr*, 482 A.2d 811, 813 n.2 (D.C. 1984). Nor, as the Supreme Court held in *Unitherm*, 546 U.S. at 402, may the appellate court grant a new trial in the absence of a post-trial request for one. Appellants argue that an exception to the waiver occasioned by the failure to renew a Rule 50(a) motion after trial may be made in cases of plain error. This was the position of the dissent in *Unitherm*, *see id.* at 407–08, but the Court rejected it, and we must do likewise.

[14] *Best*, 547 A.2d at 148.

[15] *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 156 (4th Cir. 2012).

at a minimum, there must be "substantial compliance" with Rule 50.[16]  The party must, in substance, "specify the judgment sought and the law and facts that entitle the movant to the judgment."[17]

Of the sufficiency challenges Iron Vine and Second Factor present on appeal, only those addressing the proximate causation and the certainty of Cygnacom's claimed damages (lost profits) were raised in a Rule 50(a) motion.  The challenges not included in Iron Vine's and Second Factor's Rule 50(a) motions are unreviewable for that reason.[18]  But even the challenges raised by Rule 50(a) motion during trial are not reviewable unless Iron Vine and Second Factor renewed them after the jury's verdict in compliance with Rule 50(b), and Cygnacom argues they did not do so.  Iron Vine and Second Factor respond that though they did not explicitly invoke Rule 50 in any written post-trial motion or at the post-verdict hearing, it was clear at the post-verdict hearing that they were seeking to renew all of the sufficiency arguments they had made during the trial, but the judge refused to

---

[16]  *Martinez Moll v. Levitt & Sons of P.R., Inc.*, 583 F.2d 565, 569 (1st Cir. 1978).

[17]  Super. Ct. Civ. R. 50(a)(2).

[18]  *See NCRIC*, 957 A.2d at 905.

entertain any further motions and thereby dissuaded them from filing a Rule 50(b) motion.

We are not persuaded by this excuse for not filing a Rule 50(b) motion for two reasons. First, the record of the post-verdict hearing does not support it; Iron Vine and Second Factor did not convey an intention to renew any of their prior sufficiency arguments at that hearing. Rather, they raised new issues relating to the jury's awards of damages and a possible double recovery for Cygnacom. Specifically, Iron Vine and Second Factor objected that the damages awarded on the civil conspiracy count could not exceed the damages awarded on the tortious interference count, and that the tortious interference award overlapped with the breach of contract award. The trial judge took a dim view of these claims, perceiving them as an attempt to re-litigate a verdict form to which the parties had agreed, and stated:

> [F]rankly it seems to me that both sides are trying to get a second bite at the apple[.[19]] . . . The case concluded, the jury rendered a verdict. We're not going back there again[,] . . . regarding the jury verdict form that . . . nobody had a problem with. . . . This is a matter for the Court of Appeals to resolve. There's a verdict, appeal it.

---

[19] The reference to "both sides" appears to reflect the fact that, earlier in the hearing, Cygnacom had asked the judge to reconsider the dismissal of the Virginia business conspiracy count. The judge denied that request.

Iron Vine and Second Factor then continued to urge the need to address the double recovery issue and requested that they be permitted to brief it. The court denied their request.

In the course of the post-verdict hearing, Iron Vine and Second Factor did not mention or allude to any of the sufficiency issues they had raised in their Rule 50(a) motions. They "failed to even summarily state that [they were] renewing the preverdict motion for judgment as a matter of law."[20] We therefore cannot agree that they substantially complied with Rule 50(b).[21]

Second, the trial judge's rejection at the post-verdict hearing of the parties' arguments and request to brief them did not relieve trial counsel of the responsibility to preserve their clients' sufficiency claims. There is no "futility" exception in Rule 50.[22] Even if the judge had made it very clear he would deny any Rule 50(b) motion

---

[20] *Belk*, 679 F.3d at 159.

[21] *See id.* (refusing to consider appellant's sufficiency challenges where counsel's post-verdict colloquy with the trial judge focused on *different* issues).

[22] *See, e.g.*, *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (rejecting argument that "a party need not move for judgment as a matter of law when such a motion would be futile"); *Williams v. King*, 460 P.3d 303, 309 (Ariz. Ct. App. 2020) ("Defendants assert that their mid-trial Rule 50(a) motion was sufficient, essentially arguing that a post-verdict motion for new trial was futile. But a mid-trial motion under Rule 50(a) will not preserve our jurisdiction unless

made to him (which he did not), we agree with the Fourth Circuit that "Rule 50(b) inherently accommodates such potential deterrents to filing, providing counsel with a period of time in which, detached from the pressures of trial, to reflect and to carefully consider whether to file a motion for judgment as a matter of law without obtaining the judge's permission to file."[23]

## B. Enforceability of the Non-Solicitation and Non-Competition Provisions

Iron Vine contends that the breach of contract and tortious interference verdicts cannot stand because the contractual provisions relevant to those claims — the Non-Solicitation Provision between Iron Vine and Cygnacom (which the jury found Iron Vine to have breached) and the Non-Competition Provision in the Cygnacom employees' contracts (with which the jury found Iron Vine and Second

---

followed by a post-verdict Rule 50(b) motion. And Defendants offer no authority for a futility exception.") (internal citations and quotation marks omitted)).

[23] *Belk*, 679 F.3d at 159 (rejecting argument that failure to submit a Rule 50(b) motion should be excused where judge "did not want to hear any additional argument on the sufficiency of the evidence").

Factor to have interfered) — are unenforceable under Virginia law.[24]  These are questions of law, as to which our review is de novo.[25]

## 1. Non-Solicitation Provision

As Iron Vine challenged the enforceability of the Non-Solicitation Provision in its motions to dismiss and for summary judgment, it has preserved the issue for appeal.[26]  The Non-Solicitation Provision is a restraint on trade, enforceable under Virginia law only if the party seeking its enforcement, Cygnacom, can show that it

---

[24] Virginia law applies to the interpretation of both agreements, per their plain language.

[25] *See*, *e.g.*, *Young v. District of Columbia Dep't of Emp't Servs.*, 241 A.3d 826, 829 (D.C. 2020).

[26] *See Taylor v. Wash. Hosp. Ctr.*, 407 A.2d 585, 590–91 (D.C. 1979) (litigants "disappointed by rulings of the court which are adverse to [their] case" are "free to and should proceed to trial as limited by the court's . . . rulings, and if not successful at trial challenge those rulings on appeal").  It does not matter that Iron Vine did not raise this issue in a Rule 50 motion.  The requirements of Rule 50 apply to challenges to the sufficiency of the evidence; the Rule "does not govern pure questions of law" such as those of contract interpretation and enforceability.  *Hines v. City of Columbus*, 676 Fed. App'x 546, 550 (6th Cir. 2017); *Belk*, 679 F.3d at 161 ("The rule is not concerned with 'pure' questions of law that are detached from the evidence, not within the domain of the jury, and only ever properly ruled upon by the judge."); *Landes Const. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1370 (9th Cir. 1987) ("As long as a party properly raises an issue of law" in the trial court "it need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.").

is "[1] narrowly drawn to protect the employer's legitimate business interest, [2] not unduly burdensome on the employee's ability to earn a living, and [3] not against public policy."[27] In evaluating these factors, the Virginia Supreme Court considers the "function, scope, and duration of the restriction," and assesses the factors "together rather than as distinct inquiries."[28] The restriction "must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved."[29]

Cygnacom contends that the Non-Solicitation Provision is narrowly drawn to protect its "ability to maintain professional personnel in its employ[.]"[30] The Virginia Supreme Court has recognized the validity of this interest, holding that when one employer provides services to another on a contractual basis in the form of providing staff, it risks becoming an "involuntary and unpaid employment agency" for the other party if it is not able to, for a limited duration, restrain that

---

[27] *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).

[28] *Id.*

[29] *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005).

[30] *Therapy Servs., Inc. v. Crystal City Nursing Ctr., Inc.*, 389 S.E.2d 710, 711–12 (Va. 1990).

party from hiring its employees.[31] Cygnacom asked for the Non-Solicitation Provision in order to avoid exactly the risk that the Virginia Supreme Court identified and that the jury found materialized in this case — after entering into a subcontractor relationship with Iron Vine, in which Iron Vine was in a position to learn the value and skills of Cygnacom's employees, Iron Vine undertook (in association with Second Factor) to hire away those employees. In addition, the Non-Solicitation Provision was limited to the length of the parties' relationship, plus one year after its termination. Virginia courts have sanctioned identical duration periods in other non-solicitation agreements as "narrowly drawn."[32]

Whether the Non-Solicitation Provision was sufficiently limited in scope is a closer question. Iron Vine argues that while the intent of the provision was to prevent the parties from poaching each other's employees, its language swept more broadly, extending to scenarios that did not protect Cygnacom's asserted interests. To support that contention, Iron Vine focuses on the clause barring each party from "directly or indirectly induc[ing] any employee of the other Party to terminate his or

---

[31] *Id.* at 712 (upholding a non-solicitation agreement between a nursing center and a provider of rehabilitative therapists where the agreement prohibited the nursing center from hiring the provider-employed therapists contracted to work at the center).

[32] *Preferred*, 732 S.E.2d at 681.

her employment with the other Party."  It argues that this clause is overbroad, citing the Virginia Circuit Court decision in *ManTech Int'l Corp. v. Analex Corp.*[33]  In that case, ManTech's contract with its employees similarly provided that "[d]uring the period of employment and for a period of six months thereafter, the Employee shall not directly or indirectly solicit or induce any employees of ManTech to leave the employ of ManTech."[34]  The court held this provision "unenforceable per se" because it was not limited to situations "where one employee convinces another employee to take a job with a competitor," but also appeared to cover "other imaginable scenarios, includ[ing], but [] not limited to, those circumstances in which one employee convinces another to retire early, join the military, or move to another state."[35]

While we recognize that the language at issue is susceptible to such a criticism, at least in the abstract, we are not persuaded that this alone makes the provision before us per se unenforceable under Virginia law.  As noted above, and as the *ManTech* court reiterated, "[e]ach non-compete agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of

---

[33]  75 Va. Cir. 354 (2008).

[34]  *Id.*

[35]  *Id.* at 356.

the businesses and employees involved."[36]  Circumstances present in this case that differ from those in *ManTech* satisfy us that the Non-Solicitation Provision is sufficiently limited in scope and its language was reasonably necessary to accomplish the parties' valid interests.

First, the agreement containing the Non-Solicitation Provision is not one between an employer and an employee, as was the case in *ManTech*, such that we might be concerned that an employee could innocently give a coworker advice to leave the company (e.g., retire early, join the military, relocate to another state) and run afoul of the provision.  We deal instead with two corporations "who stood upon equal footing" and well understood that the agreement was meant to preserve each party's employment of its Vanguard Subcontract staff without fear of interference by the other party.[37]  And because the provision only binds the companies, it does not constrain the behavior of their respective employees or those employees' "ability to earn a living."[38]

---

[36]  *Id.* at 355; *see Omniplex*, 618 S.E.2d at 342.

[37]  *See Foti v. Cook*, 263 S.E.2d 430, 433 (Va. 1980) (holding that the "respective positions" of the parties are relevant to whether a non-competition or non-solicitation agreement is "unreasonably harsh and oppressive").

[38]  *See Preferred*, 732 S.E.2d at 681.

Second, the Non-Solicitation Provision was made *mutual* at Iron Vine's request, signaling that Iron Vine itself thought the provision useful and appropriate for its limited duration.[39]

Third, the Non-Solicitation Provision in this case allowed for one party to "obtain[] prior written approval" of the other if it wished to "offer employment to or . . . directly or indirectly induce any employee of the other Party" to leave his or her employer. Iron Vine's ability to seek permission from Cygnacom to hire its employees or inform them about other opportunities significantly narrows, in our view, the reach of the provision, and shows that it was not concerned with (and would not be construed as applying to) innocent and transparent suggestions that an employee seek other opportunities.

Accordingly, we conclude that the trial court did not err in concluding that the Non-Solicitation Provision was enforceable under Virginia law, and the jury's breach of contract verdict stands.[40]

---

[39] The non-solicitation agreement in *ManTech*, on the other hand, applied only to one party, the employee.

[40] Our resolution of this claim in Cygnacom's favor makes it unnecessary to address Iron Vine's argument that if we were to vacate the breach of contract award, we should remand the case for a "redetermination" of the judge's award of attorneys' fees to Cygnacom. The Vanguard Subcontract provided for "reasonable attorneys'

## 2. Non-Competition Provision

Iron Vine's challenge to the Non-Competition Provision in Cygnacom's employment agreements comes to us in a significantly disadvantaged posture for purposes of appellate review. That is because Iron Vine did not argue to the trial court that the Non-Competition Provision was unenforceable as a matter of law. "It is fundamental that arguments not raised in the trial court are not usually considered on appeal."[41] We will "deviate[] from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record."[42] In other words, the strictures of review only for plain error apply — the burden is on Iron Vine to show not only (1) that the court erred, but also (2) that the error was obvious or plain, (3) that the error affected Iron Vine's substantial rights, and (4) that the error "resulted in a miscarriage of justice or seriously affected the fairness and integrity of the trial. [43]

---

fees, costs, and expenses" to a party who prevailed in an action to enforce the terms of the contract.

[41] *Thornton v. Norwest Bank of Minn.*, 860 A.2d 838, 842 (D.C. 2004).

[42] *Id.* (quoting *Williams v. Gerstenfeld*, 514 A.2d 1172, 1177 (D.C. 1986)).

[43] *See, e.g.*, *Jordan v. Jordan*, 14 A.3d 1136, 1153 (D.C. 2011).

Iron Vine cannot prevail under this demanding standard. As we explained in our discussion of the Non-Solicitation Provision, a contractual non-competition provision in an employment contract is enforceable under Virginia law if it is narrowly drawn to protect the employer's legitimate business interest, does not unduly burden the employee's ability to earn a living, and does not contravene public policy. Virginia courts determine whether a particular contractual provision satisfies these requirements by applying a three-factor balancing test that is dependent on context and the circumstances of the parties who entered into the agreement.[44] On the record before us, we cannot say that the Non-Competition Provision at issue before us obviously fails to meet Virginia's requirements; the provision is limited in duration and bars Cygnacom employees from taking employment with only a narrow category of businesses, namely, only those "actively competing against [Cygnacom] for a government procurement" or that had "competed against Cygnacom for a government procurement within the last six (6) months." The restrictions appear narrowly designed to protect Cygnacom's legitimate business interest without unduly burdening its employees' ability to earn a living or offending public policy. Moreover, it is not obvious that application of Virginia's nuanced and fact-based balancing test would undermine that conclusion. Where neither Iron Vine nor any

---

[44] *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 808 (Va. 2013); *Preferred*, 732 S.E.2d at 681; *Omniplex*, 618 S.E.2d at 342.

other party made such a claim or even raised the issue, the trial judge cannot be faulted for failing to determine on behalf of Iron Vine that the Non-Competition Provision violated Virginia law. The judge did not plainly err "by failing, *sua sponte*, to intercede in the case with theories or contentions not presented by the parties."[45]

## C.  Double Recovery Issues

The jury found Iron Vine liable to Cygnacom for breach of contract and all the defendants liable for conspiracy to commit tortious interference. Its compensatory damage award on each of those counts was $1,012,011. On the tortious interference count, however, the jury awarded Cygnacom compensatory damages of $168,668.59 against Iron Vine and $168,668.59 against Second Factor. In the post-verdict hearing, Iron Vine and Second Factor argued that (1) the conspiracy claim was derivative of the tortious interference claim, and the conspiracy (compensatory) damages award therefore could not exceed the tortious interference damages award; and (2) the compensatory damages awarded for tortious interference were duplicative because they compensated Cygnacom for the same harm as the damages awarded on the other claims, namely lost profits on the

---

[45] *Baxter v. United States*, 640 A.2d 714, 717–18 (D.C. 1994).

Vanguard Subcontract. Cygnacom ultimately agreed that the conspiracy award compensated for the same lost profit damages as the award for *breach of contract*, but argued that the tortious interference award compensated for a different and additional harm — the loss of business opportunities that Cygnacom's employees would have worked on had they not quit and found employment with Iron Vine and Second Factor. The trial judge agreed with Cygnacom's argument.

On appeal, Second Factor repeats the argument that the tortious interference award of compensatory damages is duplicative of the breach of contract award, and hence should not be added to it, because Cygnacom presented no evidence supporting a damages theory of lost business opportunities at trial; it had one theory, lost profits on the Vanguard work, for which the breach of contract award fully compensates it. It is well-settled and undisputed that while a plaintiff may "pursue numerous possible avenues of relief simultaneously and may obtain several judgments against different persons for the same obligation or liability," the plaintiff may be compensated for a single harm only once.[46]

---

[46] *Saunders v. Hudgens*, 184 A.3d 345, 350 (D.C. 2018) (quoting 47 AM. JUR. 2D *Judgments* § 769); *see also Dyer v. William S. Bergman & Assocs., Inc.*, 657 A.2d 1132, 1141 (D.C. 1995) ("[I]n the absence of punitive damages, a plaintiff can recover no more than the loss actually suffered." (quoting *Kassman v. American Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976)); RESTATEMENT (SECOND) OF JUDGMENTS § 50, cmt. d (1982).

Accordingly, Cygnacom is entitled to recover compensatory damages above the amount of its lost profit damages only if the additional sum represents compensation for a harm distinct from its lost profits. Although Cygnacom maintains that its tortious interference damages award was not for lost profits on the Vanguard Subcontract, but for "lost business opportunities" unrelated to the Vanguard work, we are not persuaded. The record is quite clear that Cygnacom pursued a *single* theory of damages for *all* of its claims — the loss of five years' of future profits on the Vanguard Subcontract.

Cygnacom presented one employee, Ella Schwartz, to testify to the company's damages at trial. Schwartz testified that the company had earned $337,337.18 from work under the Vanguard Subcontract in 2015, the last year in which the subcontract was in effect. Had the company earned identical profits for the next five years, until 2021, it would have made another $1,686,000 on the Vanguard Subcontract. Schwartz briefly mentioned that Cygnacom spent "a great deal of money" to replace its lost employees, but those costs were not introduced into evidence, and Cygnacom's CEO later expressly denied that the company was seeking to recover those expenses as damages. And while Schwartz testified that when the employees resigned, Cygnacom was "actively bidding" on new work for

them, no evidence of what that work entailed or how much it was worth was introduced.

Thereafter, in closing argument, Cygnacom told the jury it was "only seeking damages that were directly earned from Iron Vine performing the remainder of the contract" without Cygnacom, and that $1,686,000 over five years was a "conservative" but "reasonable" estimate of those damages. Cygnacom disclaimed any request to be compensated for the cost of replacing employees or "losing potential contract revenues on other contracts." Its counsel then assured the jury that,

> if you think we're entitled to the same damage for different conduct . . . please put the numbers down on both places on the jury verdict form. We won't get double counted, we'll clean that up on the back.

Where the jurors heard this single theory of damages, we can only conclude that the $337,337.18 they assessed against Iron Vine and Second Factor together for the tortious interference claim represents a finding that the interference caused one year's worth of lost profits to Cygnacom under the Vanguard Subcontract. But the jury's breach of contract award against Iron Vine for breach of contract, based on identical conduct, compensates Cygnacom for the equivalent of *three years* of lost Vanguard profits, $1,012,001. It is impossible to tell from the awards themselves

whether the year of lost profits awarded for the tortious interference claim represents a finding by the jury that together, Iron Vine's and Second Factor's interference and Iron Vine's separate breach caused Cygnacom to lose a total of four years of profits under the subcontract, as opposed to a finding that those actions caused only three years of lost profits, only one of which was attributable to the actual loss of the employees. Cygnacom compounded this problem, in our view, by explicitly telling the jury to assess damages in multiple places on the verdict form and assuring them that the parties would "clean [] up" any double recovery later.[47]

However, Cygnacom's concession that the jury's civil conspiracy award compensates for the same harm as the breach of contract award (the two awards were in the same amount) confirms that the tortious interference award is also based on the same harm. Civil conspiracy is not an independent tort; rather it is "a means for establishing vicarious liability for [an] underlying tort."[48] In this case, tortious

---

[47] *Cf. Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1148 (D.C. 1991) (though compensatory damages award for § 1983 claim was possibly duplicative of damages assessed against the defendants for other torts, judge's *clear* instructions that the jury was to only award damages which, in the aggregate, compensated the plaintiff for injuries actually suffered from each tort, mitigated the risk of double recovery such that the jury's award could stand).

[48] *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994). In order to state a claim for civil conspiracy, a plaintiff must show "an injury caused by an unlawful overt

interference with the Cygnacom employees' contracts was the underlying tort that Cygnacom proved up to the jury in order to state its civil conspiracy claim, yet on appeal, Cygnacom contends that the two claims are unrelated and that the conspiracy to commit tortious interference caused it to lose profits on the Vanguard Subcontract while the tortious interference itself caused a different harm. This is not logically sound.

Accordingly, we direct the trial court on remand to revise its judgment to ensure that Cygnacom does not receive compensatory damages in excess of the amount, $1,012,001, awarded for its lost profit damages on the breach of contract and the conspiracy counts.[49]

## D. The Virginia Business Conspiracy Claim

We come now to Cygnacom's cross-appeal.

---

act" (i.e. tortious conduct), along with "an agreement between two or more persons" to participate in that act, in furtherance of a common scheme or plan. *Id.*

[49] We leave it to the trial court to engineer this, but we note that it may involve setting aside the award against Second Factor on the tortious interference count and entering judgment declaring Iron Vine and Second Factor liable, jointly and severally, for the amount awarded on the conspiracy count, since only Iron Vine was found liable on the breach of contract count.

## 1. Background — The Trial Court's Ruling

Claiming that at least some of Shanley's, Second Factor's, and Iron Vine's actions in furtherance of a conspiracy to hire its employees took place in Virginia, Cygnacom's complaint alleged a violation of Virginia's business conspiracy statute, Va. Code §§ 18.2-499–18.2-500. To recover under this statute, a plaintiff must establish "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff."[50]

On the final day of trial, after both parties had rested, the defendants orally moved to dismiss the Virginia business conspiracy count, arguing, for the first time, that any conspiracy Cygnacom could prove had taken place in the District, not in Virginia, and thus the Virginia statute could not apply to Cygnacom's conspiracy claims. The defendants provided the court with two cases, both from the United States District Court for the District of Columbia, in which the trial court dismissed Virginia business conspiracy claims after concluding that choice-of-law considerations weighed in favor of applying District, rather than Virginia, law.[51]

---

[50] *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (quoting *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984)).

[51] *See Guttenberg v. Emery*, 41 F. Supp. 3d 61 (D.D.C. 2014); *B&H Nat'l Place, Inc. v. Beresford*, 850 F. Supp. 2d 251 (D.D.C. 2012).

Cygnacom objected both on the merits and to the timing of the motion.  The judge agreed that the motion was "problematic in terms of the timing," but after hearing the parties' arguments on the merits and taking a brief recess to consider the cases provided by the defendants, the judge determined that he could and would resolve the issue.  The judge stated that resolution of the choice-of-law dispute required consideration of four factors: "Number 1: The place where the injury occurred; Number 2: The place where the conduct causing the injury occurred; Number 3: The domicile, residence, nationality, place of incorporation, and place of the business of the parties; and Number 4: The place where the relationship, if any, between the parties is centered."  The judge concluded that these factors favored a finding that the District had the greater interest in having its law apply to "protect[] entities doing business in the District," because Cygnacom's injury occurred in the District; the relationship of the parties was centered in the District; and conduct underlying the conspiracy occurred in both states — though, as the judge noted, all businesses involved were incorporated in Virginia.  The judge therefore dismissed the Virginia business conspiracy count.

On appeal, Cygnacom challenges that dismissal in two respects.  First, it argues that Iron Vine and Second Factor waived any choice-of-law issue by failing to raise it at least in their pretrial statements (if not also in their answers to the

complaint) and that the judge abused his discretion by essentially modifying the pretrial order pursuant to Civil Rule 16(g)(2) and considering a new legal issue after all the evidence was in.  Second, Cygnacom argues that the judge's choice-of-law analysis was in error.

## 2. Civil Rule 16

Civil Rule 16 includes several provisions that are intended to encourage parties to raise and resolve dispositive issues before trial and to "remove cases from the realm of surprise."[52]  Notably, the Rule includes deadlines for dispositive motions, motions *in limine*, and the joint pretrial statement, which frames the issues for trial.[53]  By the time the trial court issues the pretrial order, in which "insofar as possible, the court . . . resolves all pending disputes,"[54] the parties will have had ample opportunity to raise issues of law that are for the judge, not the jury, to resolve,

---

[52]  *Taylor v. Wash. Hosp. Ctr.*, 407 A.2d 585, 592 (D.C. 1979); *see also Daniels v. Beeks*, 532 A.2d 125, 128 (D.C. 1987).

[53]  *See* Super. Ct. Civ. R. 16(b)(5)(F) (scheduling order will "specify a date by which dispositive motions will be decided"), R. 16(d) ("any motion *in limine*, motion to bifurcate, or other motion respecting the conduct of the trial" must be filed "three weeks prior to the pretrial conference"), R. 16(e)(1) (joint pretrial statement is due "one week prior to the pretrial conference").

[54]  *Id.* R.16(g)(1).

including choice-of-law issues. Because these pretrial procedures enable the parties to identify and narrow the issues for trial, the pretrial order, once entered, "controls the course of the action unless the court modifies it."[55]

Nonetheless, Rule 16 recognizes that the "pretrial order may be modified at the discretion of the court for good cause."[56] In determining whether a trial court abused its discretion in allowing a party to modify a pretrial statement or raise a new issue after the pretrial order is set, three factors are particularly relevant: first, and most importantly, "whether the opposing party was surprised or would have been prejudiced by the requested change;" second, whether the issue involves evidence "newly discovered" after the pretrial conference; and third, the timing of the request.[57] We treat "less favorably" those motions made "on the day of trial or on the eve of trial."[58]

---

[55]  *Id.*; *see also Taylor*, 407 A.2d at 592 (parties "generally are bound by the pretrial order").

[56]  Super. Ct. Civ. R. 16(g)(2).

[57]  *Daniels*, 532 A.2d at 128.

[58]  *Id.* at 129.

While the third factor obviously weighed against consideration of the belatedly raised motion to dismiss, we think the remaining factors show the judge's decision to consider the motion on its merits was supported by substantial reasoning.[59] Cygnacom's only claim of prejudice is that it did not have an opportunity to read the authorities cited to the judge in support of dismissing the claim or to "research other authorities to formulate its own arguments." The record, however, shows that the judge recessed to read the cases (giving Cygnacom time to do so as well), that he heard a thorough argument on the issue, and that Cygnacom's counsel presented a clear and cogent defense to the motion on its merits. The defendants also plausibly claimed that the facts underlying the motion only became clear as the evidence at trial came in and showed that any conspiracy alleged by Cygnacom took place in and was focused on work within the District. The accuracy of this claim of "newly discovered" evidence is so closely linked to the choice-of-law issue itself (in that it involved a factual assessment based on the evidence of the place where the injury occurred, the parties' principal places of business, etc.), that the more practical course for the judge, where no apparent prejudice to Cygnacom existed, was to consider the motion to dismiss on its merits. We will continue to do the same on appeal.

---

[59] *See Briggs v. Israel Baptist Church*, 933 A.2d 301, 303–04 (D.C. 2007) (citing *Johnson v. United States*, 398 A.2d 354, 364–65 (D.C.1979)).

## 3. Choice of Law

We review choice-of-law questions *de novo*; in a tort case, applying a "governmental interests" analysis.[60] We will "appl[y] another state's law when [] its interest in the litigation is substantial, and [] application of District of Columbia law would frustrate the clearly articulated public policy of that state."[61] In order to "facilitate" this analysis, we consider four factors enumerated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145: "a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered."[62] If, after a "qualitative weighing" of these factors,[63] we find that "the policy of one jurisdiction would be advanced by the application of its law, and the policy of the other jurisdiction would not be advanced

---

[60] *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

[61] *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (internal quotation marks omitted).

[62] *Id.*; *see also Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) ("The Restatement factors help to identify the jurisdiction with the 'most significant relationship to the dispute,' that presumptively being the jurisdiction whose policy would be more advanced by application of its law." (quoting *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 & n.18 (D.C. 1989)).

[63] *Jones v. Clinch*, 73 A.3d 80, 83 (D.C. 2013) (internal quotation marks omitted).

by the application of its law, a false conflict appears and the law of the interested jurisdiction prevails."[64]   Consideration of the Restatement factors in this case persuades us that Virginia, not the District, is the jurisdiction with a substantial interest in Cygnacom's conspiracy claim.[65]

The first and third Restatement factors weigh heavily in our analysis.  All three corporations involved in this appeal are incorporated in Virginia, and Cygnacom's headquarters and principal place of business are in Virginia.  The Restatement advises that the plaintiff's principal place of business is the "most important contact for determining the state of the applicable law" where a tort causes primarily a "financial injury."[66]  That is the situation here, because Cygnacom's

---

[64]   *Coleman*, 667 A.2d at 816 (alterations and internal quotation marks omitted).

[65]   This case is thus factually distinguishable from the cases on which Iron Vine and Second Factor relied at trial, in which an analysis of the Restatement factors showed that the District had the greater interest in the controversies at issue. *See Guttenberg*, 41 F. Supp. 3d at 71–72 (District law applied and precluded the application of the Virginia business conspiracy statute where the case involved a "D.C. injury resulting from conduct mostly occurring in Virginia; plaintiffs [who] reside and do business in D.C.; defendants [who] reside in Virginia and do business in D.C. . . . ; and [a] relationship between the parties . . . centered in D.C."); *B&H Nat'l Place*, 850 F. Supp. 2d at 262 n.19 (Va. Code § 18.2-499 did not apply to case where "the essence of the alleged harm," the opening of a restaurant franchise in violation of a contract, occurred in the District).

[66]   *Id.*, cmt. f.

injury, lost profits, is pecuniary. Pecuniary harm to a plaintiff "will normally be felt most severely at the plaintiff's headquarters or principal place of business."[67]

Second, although the conduct causing Cygnacom's injury occurred both in the District and in Virginia, much that was consequential took place in Virginia. Shanley testified at trial that Second Factor made its hiring decisions from Shanley's home address in Virginia, and that the December 2015 agreement between Iron Vine and Second Factor to take over the PKI services then being performed by Cygnacom was signed in Virginia and is governed by Virginia law. That much of the unlawful conduct took place in Virginia is significant in our analysis. The purpose of Va. Code §§ 18.2-499–18.2-500 is to protect the financial interests of persons and corporations doing business in the state by "provid[ing] a remedy for wrongful conduct directed towards one's business[.]"[68] Section 18.2-500 "explicitly allows an award of treble damages on proof of the cause of action provided under [Va.] Code § 18.2-499,"[69] reflecting a Virginia policy to heavily punish conspiracies to

---

[67] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. f (1971); *see also Guttenberg*, 41 F. Supp. 3d at 71 (effects of the defendants' disparagement of the plaintiffs' business were felt in the District, the business's principal location).

[68] *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F. Supp. 858, 863–64 (E.D. Va. 1980).

[69] *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 158 (Va. 1998).

injure businesses, a policy which the District, a jurisdiction without a statutory cause of action for conspiracy, does not have. Where "the primary purpose of the tort rule involved is to deter or punish misconduct . . . the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship."[70]

Third, the trial court's conclusion that the "relationship between the parties . . . is centered in the District" reflected the fact that the State Department work under the Vanguard Subcontract was being performed, at the time of the conspiracy, primarily in the District. But Cygnacom points out that there was evidence the future situs of that work was expected to change; Shanley acknowledged at trial that the PKI services performed by the Cygnacom employees were slated to move to Virginia in 2016. The parties' relationship, therefore, was not statically centered in one jurisdiction, and does not demonstrate that the District had the more significant interest in this dispute. Rather, the evidence indicates that the bulk of the lost profits that Cygnacom was awarded were attributable to work that was to be performed in Virginia, from which Cygnacom was excluded by the alleged business conspiracy.

In sum, the application of District law here would preclude a Virginia statutory action designed to protect the interests of Virginia businesses and punish

---

[70] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. c (1971).

persons who unlawfully conspire to injure a business or trade, in a case involving three Virginia corporations, subcontract and employment agreements governed by Virginia law, conspiratorial activity in Virginia, and a financial injury felt entirely in Virginia and attributable in large part to lost Virginia business. Given all those circumstances, we conclude that Virginia law must be applied to Cygnacom's conspiracy claim. Thus, we reverse the dismissal of Cygnacom's Virginia business conspiracy claim and remand the case for such further proceedings on that count as may be appropriate.[71]

## IV. Conclusion

For the foregoing reasons, we reverse the trial court's dismissal of Cygnacom's Virginia business conspiracy claim and remand the case with instructions that the trial court (1) conduct further proceedings on that claim; and (2) revise the judgment as explained herein to avoid double recovery of compensatory damages (while protecting Cygnacom's right to obtain a full recovery from the

---

[71] The parties can address on remand whether a trial on liability under the Virginia treble damages statute is required in light of the jury's verdict on the civil conspiracy claim and its award of punitive damages, whether compensatory damages under the Virginia statutory claim are any different from those awarded by the jury under the D.C. claim, whether any fact finding is necessary with respect to trebling of compensatory damages under the Virginia statute, and whether Cygnacom is entitled to additional attorney fees under Va. Stat. Ann. § 18.2-500(A).

defendants of the lost profits damages that the jury awarded).  In all other respects, we affirm the judgment of the Superior Court.